## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| FIRST NATIONAL BANK AND TRUST COMPANYOF ROCHELLE, ILLINOIS, | ) ) ) | |
| Plaintiff, | ) ) | No. 1:13-CV-05693 |
| v. | ) ) | Hon. Rebecca R. Pallmeyer |
| THE MCGRAW-HILL COMPANIES, INC., STANDARD & POOR'S FINANCIAL SERVICES, LLC., STANDARD & POOR'S RATINGS SERVICES, and MOODY'S CORP., MOODY'S INVESTORS SERVICES, INC., | ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

1.      Plaintiff First National Bank and Trust Company of Rochelle, Illinois ("FNBR") brings this action, on its own behalf and on behalf of a class of similarly situated investors, against two credit rating agencies: (1) the McGraw-Hill Companies, Inc., its subsidiary Standard & Poor's Financial Services, LLC and its business unit Standard & Poor's Ratings Services ("S&P") (collectively the "S&P Companies") and (2) Moody's Corp. and its subsidiary Moody's Investors Service, Inc. (collectively referred to as "Moody's") (all defendants collectively referred to as the "Rating Agency Defendants" or "RAs").  FNBR sues the RAs for knowingly or recklessly issuing inflated ratings on residential mortgage backed securities ("RMBS") and then failing to correct those ratings when the residential mortgage loans underpinning the RMBS experienced delinquencies and defaults in far greater numbers than the ratings connoted.

2.      FNBR is a prudent investor that follows a conservative investment strategy, which

has historically proven successful. However, when the bank purchased RMBS certificates that the RAs rated as investment grade, FNBR was required to book losses as to those investments. FNBR's RMBS investments were unsuccessful, not because the bank's conservative approach failed, but because FNBR relied upon inflated ratings.

3. FNBR and the other class member investors purchased RMBS certificates believing that the ratings were reliable and credible. Such belief arose from the industry practice of relying on ratings by credit ratings agencies designated as nationally recognized statistical rating organizations ("NRSROs") as reliable indications of credit quality and value.

4. Had FNBR and the other class members known that the ratings were false or recklessly issued, FNBR and the other class members would not have purchased the RMBS certificates.

5. The ratings at issue were false and recklessly issued, *i.e.*, they lacked credibility and reliability, because the Rating Agency Defendants had abandoned their policies, procedures, independence, objectivity, rigorous modeling and analysis, which had been the hallmark of their ratings and supported their all-important designation by the Securities and Exchange ("SEC") as a "nationally recognized statistical rating organization" ("NRSRO"). Such designation permitted S&P and Moody's to engage in the highly lucrative business of rating RMBS and, in particular, the business of rating RMBS that could be purchased by banks to meet their regulatory reserve requirements.

6. FNBR sues under Illinois statutory law for violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*, ("CFA") and the Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq.*, ("UDTPA") and under Illinois common

law for common law fraud and negligent misrepresentation.  FNBR brings these claims on its own behalf and on behalf of a class of all Illinois community banks that purchased RMBS carrying the highest ratings by S&P ("AAA") or Moody's ("Aaa") (collectively "AAA") from December 2007 through February 2008.

## INTRODUCTION

7.      Exhaustive investigations by the federal government, state attorneys general and private parties[1] have found that the oligarchic credit rating agencies S&P and Moody's[2] made a Faustian bargain with Wall Street to prostitute their ratings, independence and reputations[3] in return for unprecedented profits.[4]  One government investigation is detailed in the April 13, 2011 report of the Permanent Subcommittee on Investigations of the United States Senate, titled "Wall

---

[1] Various governmental investigations, regulatory actions and litigations of and against the RAs in connection with their inflated credit ratings leading up to the financial meltdown of 2008 are referenced herein and include links to websites.  Plaintiff incorporates the referenced and linked materials as if fully alleged in the Complaint and requests that the Court take judicial notice of the facts and hyperlinked documents referenced and incorporated in this Complaint.

[2] *See* Testimony of Professor John C. Coffee, Jr. before the U.S. Senate Comm. on Banking, Housing and Urban Affairs, "Turmoil in the U.S. Credit Markets:  The Role of the Credit Rating Agencies" (April 22, 2008) ("Coffee Testimony") at 2 ("An Oligopolistic Market. Until very recently, the reality was that only three credit rating agencies were recognized by the SEC as 'NRSROs' ("Nationally Recognized Statistical Ratings Organizations"). Moreover, because the long-standing convention has been that an issuer must obtain two ratings on its debt securities, competition was even weaker than this number would indicate. In turn, weak competition implied that the credit rating agencies needed to worry less about preserving their 'reputational capital' than in other markets where involvement in a major scandal could stigmatize or destroy a firm."), available at http://1.usa.gov/KiZiF2.  The three major credit rating agencies, Moody's, S&P, and Fitch Rating Ltd., each of which is a NRSRO, reportedly issue about 98% of total credit ratings and collect 90% of total credit rating revenue.  PSI at 247.

[3] "Frank Raiter says his former employer, Standard & Poor's, placed a 'For Sale' sign on its reputation on March 20, 2001.  That day, a member of an S&P executive committee ordered him, the company's top mortgage official, to grade a real estate investment he'd never reviewed."  Raiter was directed to rely on ratings issued by another company.  "Relying on a competitor's analysis was one of a series of shortcuts that undermined credit grades issued by S&P and rival Moody's Corp., according to Raiter."  Smith, Elliot Blair, "Bringing Down Wall Street as Ratings Let Loose Subprime Scourge," Bloomberg September 24, 2008, available at http://www.bloomberg.com/apps/news?sid=ah839IWTLP9s&pid=newsarchive.

[4] "Looking back after the first shock of the crisis, one Moody's managing director offered this critical self analysis: '[W]hy didn't we envision that credit would tighten after being loose, and housing prices would fall after rising, after all most economic events are cyclical and bubbles inevitably burst. Combined, these errors make us look either incompetent at credit analysis, or like we sold our soul to the devil for revenue, or a little bit of both.'" PSI Report at 245 (Moody's Managing Director, Moody's Town Hall Feedback, Sept. 2007, Moody's 0052080, at 79).

Street and the Financial Crisis: Anatomy of a Financial Collapse" ("PSI Report"), available at http://on.ft.com/dRZ2B8 and incorporated herein by reference. The PSI Report was issued after "a two-year, bipartisan investigation" which included direct examination of witnesses and the review of "tens of millions of pages of documents, including court pleadings, filings with the Securities and Exchange Commission, trustee reports, prospectuses for public and private offerings, corporate board and committee minutes, mortgage transactions and analyses, memoranda, marketing materials, correspondence and email," and "documents prepared by or sent to or from banking and securities regulators, including bank examination reports, reviews of securities firms, enforcement actions, analyses, memoranda, correspondence, and email." PSI Report, at 1-2.

8.      "For more than a year, the Subcommittee conducted an in-depth investigation of the role of credit rating agencies in the financial crisis, using as case histories Moody's and S&P. The Subcommittee subpoenaed and reviewed hundreds of thousands of documents from both companies including reports, analyses, memoranda, correspondence, and email, as well as documents from a number of financial institutions that obtained ratings for RMBS and CDO securities. The Subcommittee also collected and reviewed documents from the SEC and reports produced by academics and government agencies on credit rating issues. In addition, the Subcommittee conducted nearly two dozen interviews with current and former Moody's and S&P executives, managers, and analysts, and consulted with credit rating experts from the SEC, Federal Reserve, academia, and industry." PSI at 245.

9.      The PSI concluded that Moody's and S&P issued and maintained inflated ratings. PSI Report, at 245-46 and 268. The PSI contained the following findings of fact:

**Inaccurate Rating Models.** From 2004 to 2007, Moody's and S&P used credit rating models with data that was inadequate to predict how high risk residential mortgages, such as subprime, interest only, and option adjustable rate mortgages, would perform.

**Competitive Pressures.** Competitive pressures, including the drive for market share and need to accommodate investment bankers bringing in business, affected the credit ratings issued by Moody's and S&P.

**Failure to Re-evaluate.** By 2006, Moody's and S&P knew their ratings of RMBS and CDOs were inaccurate, revised their rating models to produce more accurate ratings, but then failed to use the revised model to re-evaluate existing RMBS and CDO securities, delaying thousands of rating downgrades and allowing those securities to carry inflated ratings that could mislead investors.

**Failure to Factor in Fraud, Laxity, or Housing Bubble.** From 2004 to 2007, Moody's and S&P knew of increased credit risks due to mortgage fraud, lax underwriting standards, and unsustainable housing price appreciation, but failed adequately to incorporate those factors into their credit rating models.

**Inadequate Resources.** Despite record profits from 2004 to 2007, Moody's and S&P failed to assign sufficient resources to adequately rate new products and test the accuracy of existing ratings.

**Mass Downgrades Shocked Market.** Mass downgrades by Moody's and S&P, including downgrades of hundreds of subprime RMBS over a few days in July 2007, downgrades by Moody's of CDOs in October 2007, and actions taken

(including downgrading and placing securities on credit watch with negative implications) by S&P on over 6,300 RMBS and 1,900 CDOs on one day in January 2008, shocked the financial markets, helped cause the collapse of the subprime secondary market, triggered sales of assets that had lost investment grade status, and damaged holdings of financial firms worldwide, contributing to the financial crisis.

**Failed Ratings.** Moody's and S&P each rated more than 10,000 RMBS securities from 2006 to 2007, downgraded a substantial number within a year, and, by 2010, had downgraded many AAA ratings to junk status.

**Statutory Bar.** The SEC is barred by statute from conducting needed oversight into the substance, procedures, and methodologies of the credit rating models.

**Legal Pressure for AAA Ratings.** Legal requirements that some regulated entities, such as banks, broker-dealers, insurance companies, pension funds, and others, hold assets with AAA or investment grade credit ratings, created pressure on credit rating agencies to issue inflated ratings making assets eligible for purchase by those entities.

PSI Report, at 245-46.

9.     S&P and Moody's misrepresented directly and indirectly and by omission to FNBR and similarly situated banks and investors that their credit ratings services employed methods based upon well researched historical data in support of mathematical models of risk of default and non-payment, careful analysis of whether there was sufficient cash flow to meet anticipated payments to investors, and "a legal analysis 'ensuring that there was no structural risk

presented due to a failure to fulfill minimally necessary legal requirements . . . and confirming that the deal documentation accurately and faithfully described the structure modeled by the Quant [quantitative analyst]." PSI at 251-253.

10.     The mathematical models used by S&P and Moody's to rate subprime RMBS were not based on appropriate data.  In 2009, the Congressional Oversight Panel found that the models made optimistic assumptions about the continued rise in housing prices and that "[m]any of the models involved excessively rosy assumptions about the quality of the underlying mortgages, ignoring the fact that these mortgages (especially subprime mortgages) were far riskier than ever before and were in fact becoming steadily riskier by year. . . . 'In addition to the recent growth in subprime origination, there has also been a growth in the risk factors associated with subprime mortgages.  Studies indicate that the percentage of subprime loans with less-than-full documentation, high combined loan to total value (CLTVs) and second liens grew substantially between 1999 and 2006.  Notably, while 2/28 adjustable rate mortgages comprised just 31 percent of subprime mortgages in 1999, they comprised almost 69 percent of subprime loans in 2006.  Further, 40-year mortgages were virtually non-existent prior to 2005, but they made up almost 27 percent of the subprime loans in 2006.  These data provide evidence that the majority of subprime origination occurred within the last five years, and the loans containing very high risk combinations are even more recent.' . . .  Given these dramatic changes in the mortgage market, basing models on historical mortgage data may have proved particularly problematic."  Congressional Oversight Panel, "Special Report On Regulatory Reform" issued January 2009, at 41-42 and n. 88, available at http://www.gpo.gov/fdsys/pkg/CPRT-111JPRT47018/pdf/CPRT-111JPRT47018.pdf.

11.     The Senate Permanent Subcommittee on Investigations similarly found that:

> "[t]he [rating agency] models failed, in part, because they relied on historical data to predict how RMBS securities would behave, and the models did not use adequate performance data in the development of criteria to rate subprime and other high risk mortgages that proliferated in the housing market in the years leading up to the financial crisis. . . . In contrast to decades of actual performance data for 30-year mortgages with fixed interest rates, the new subprime, high risk products had little to no track record to predict their rates of default. In fact, Moody's RMBS rating model was not even used to rate subprime mortgages until December 2006; prior to that time, Moody's used a system of 'benchmarking' in which it rated a subprime mortgage pool by comparing it to other subprime pools Moody's had already rated. . . . In addition, the models operated with subprime data for mortgages that had not been exposed to stagnant or falling housing prices. . . . The absence of relevant data for use in RMBS modeling left the credit rating agencies unable to accurately predict mortgage default and loss rates when housing prices stopped climbing."

PSI at 288-89.

12.     Moody's and S&P assigned inflated ratings upon the issuance of RMBS, including the RMBS certificates at issue, during at least 2004-2007, and then compounded their misdeeds and errors by failing to correct ratings that they knew were inflated or for which they knew they lacked an adequate basis. PSI at 267-72.

13.     The RAs' bastardization of their ratings contradicts S&P and Moody's carefully crafted public reputation for "integrity, independence, objectivity, transparency, credibility, and quality," and undercuts their qualifications as NRSROs and the eligibility of their AAA-rated RMBS to be used as capital reserves for a bank. S&P acknowledged that its ratings incorporate the characteristics of reliability and credibility, that investors relied on its ratings and that "integrity, independence, objectivity, transparency, credibility and quality" were "fundamental" components of its ratings:

- 8 -

Standard & Poor's believes that over the last century credit ratings have served the U.S. securities markets extremely well as an effective and objective tool for the market to evaluate and assess credit risk. Standard & Poor's supports a more open and transparent process to designate Nationally Recognized Statistical Rating Organizations ("NRSROs"), and believes that the designating criteria should focus on market recognition and the independence, objectivity and transparency of a credit rating agency's rating process. *Standard & Poor's recognizes the unique and valuable role that credit rating agencies play in the U.S. securities markets and is committed to protecting the reputation and future of its credit ratings business by ensuring that integrity, independence, objectivity, transparency, credibility and quality continue as fundamental premises of its operations.* . . .

*Credit ratings are an important component of the capital markets and have functioned effectively for close to a century in the United States. The role of credit ratings is also growing and flourishing in many countries abroad with the development of global capital markets. Credit ratings help the market to effectively and efficiently evaluate and assess credit risk, price debt securities, benchmark issues and create a robust secondary market for those issues.*

*Critical to a credit rating agency's ability to serve this key market role is its meeting the highest standards of integrity, independence, objectivity, transparency, credibility and quality.* Standard & Poor's credit ratings have achieved worldwide investor acceptance and recognition as easily usable tools for differentiating credit quality because of Standard & Poor's excellent track record and its reputation. Despite the changing environment, Standard & Poor's core values remain the same: to provide high-quality, objective, value-added analytical information to the marketplace. . . .

Market acceptance and recognition of a credit rating depends on the credibility of the opinions of the credit rating agency issuing the credit rating, not only with issuers and investors, but also with bankers, financial intermediaries and securities traders. *Underlying the credibility of Standard & Poor's credit ratings is the market's recognition of the independence and objectivity of Standard & Poor's credit ratings and rating process and its excellent track record.* . . .

Most importantly, the ongoing value of Standard & Poor's credit ratings business is wholly dependent on continued market

> confidence in the credibility and reliability of its credit ratings. No single issuer fee or group of fees is important enough to risk jeopardizing the agency's reputation and its future.

[emphasis added]   Standard & Poor's Rating Services, U.S. Securities and Exchange Commission Public Hearing on November 15, 2002, on the "Role and Function of Credit Rating Agencies in the U.S, Securities Markets" at 1-2, available at http://www.sec.gov/news/extra/ credrate/standardpoors.htm.

14.     Despite knowing during the class period from December 2007 through February 2008 that their ratings were inflated, inaccurate, misleading and without sufficient basis, the RAs failed to revise the ratings on various AAA certificates purchased by FNBR and the other putative class members.

15.     FNBR and the other putative class members saw and relied on the AAA ratings and the integrity and reliability of those ratings and the *integrity, independence, objectivity, transparency, credibility and quality* of the ratings agencies in making their purchase decisions.

16.     FNBR and the other community bank class members purchased the AAA-rated bonds pursuant to regulatory capital requirements. When the bonds were downgraded, the banks had to sell or write down the value of the bonds or purchase and reserve additional bonds or reserve other assets to meet capital requirements, thus diminishing the funds available for lending and other profit-making business.  Additionally, bank regulators imposed more stringent requirements on banks owning compromised RMBS, which resulted in higher costs to FNBR and other banks.

17.     The RAs engaged in unfair and deceptive acts or practices by misrepresenting directly or indirectly to FNBR and the putative class that their services had characteristics, uses

or benefits that they did not have, and that their services were of a particular standard, quality or grade; all of which violate the Illinois CFA and UDTPA. The RAs' inflated ratings and misrepresentations as to the characteristics of its ratings also constitute fraud and reckless misrepresentation under Illinois common law.

18.  Defendants are liable for the losses to FNBR and the class caused by their deceptive, misleading, reckless or intentional misrepresentations with regard to their AAA ratings on certificates purchased by FNBR and putative class members.

## JURISDICTION AND VENUE

19.  The Court has jurisdiction of this case pursuant to CRA, 815 ILCS 505/1 *et seq.,* including 815 ILCS 505/2, and UDTPA, 815 ILCS 510/1 *et seq.*, including 815 ILCS 510/2(a)(5), (7), (9) and (12).

20.  Venue in Cook County is proper under Section 2-101 and 2-102(a) of the Illinois Code of Civil Procedure, 735 ILCS 5/2-101 and 735 ILCS 5/2-102(a) because the harm alleged in the Complaint occurred, at least in part, in Cook County and because Defendants are foreign corporations amenable to suit in any county in Illinois.

## TRADE AND COMMERCE

21.  Subsection 1(f) of the CRA, 815 ILCS 505/1(f), defines "trade" and "commerce" as "the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this State. Defendants engage in and have engaged in trade and commerce in Illinois by issuing credit ratings for RMBS purchased by investors located in Illinois.

## PARTIES

### First National Bank of Rochelle

22.     Plaintiff First National Bank and Trust Company of Rochelle, Illinois is a federally chartered community bank located at 340 May Mart Drive, Rochelle, Illinois 61068. FNBR purchased the following subprime, AAA-rated certificates (the "Certificates") in the after-market from December 2007 through February 2008, all of which were subsequently downgraded:

(i)     tranche A14 of CWALT 2005-46CB; issued on 8/30/2005, purchased by FNBR on February 5, 2008; downgraded by Moody's to Ba2 on 2/20/2009, to Ba2*-(sf) on 1/14/2010, to Caa2(sf) on 10/01/2010.

(ii)    tranche 1A12 of FHAMS 2006-FA1; issued 2/28/2006; purchased by FNBR on February 7, 2008; downgraded by S&P to AAA*- on 10/15/2008, by Moody's to Caa1 on 1/29/2009, by S&P to B on 4/06/2009, by S&P to CCC(sf) on 7/24/2009, by Moody's to Caa1*-(sf) on 1/14/2010, by Moody's to Caa3(sf) on 9/16/2010, and by S&P to D (sf) on 7/26/2011.

(iii)   tranche 1A3 of FHAMS 2006-FA1; issued 2/28/2006; purchased by FNBR on December 20, 2007; downgraded by S&P to AAA*- on 10/15/2008, by Moody's to Caa1 on 1/29/2009, by S&P to B on 4/06/2009, by S&P to CCC(sf) on 7/24/2009, by Moody's to Caa1*-(sf) on 1/14/2010, by Moody's to Caa3 (sf) on 9/16/2010, by S&P to D (sf) on 7/26/2011.

(iv)    tranche 1A10 of RALI 2006-QS3; issued 3/30/2006; purchased by FNBR on December 12, 2007; downgraded by S&P to AAA*- on 10/15/2008, by S&P to A

on 10/27/2008, by Moody's to Caa2 on 2/26/2009, by S&P to A*- on 3/09/2009, by S&P to CCC on 7/24/2009, by Moody's to Caa2*-(sf) on 1/14/2010, by S&P to CC on 2/26/2010, by S&P to D (sf) on 2/24/2010, and by Moody's to Caa3 (sf) on 12/23/2010.

(v)     tranche A5B of DBALT 2006-AB2; issued 5/30/2006; purchased by FNBR on December 13, 2007; downgraded by Moody's to Aaa*- on 3/19/2008, by S&P to AAA*- on 4/29/2008, upgraded by S&P to AAA on 7/15/2008, upgraded by Moody's to Aaa on 7/31/2008, downgraded by Moody's to Caa1 on 2/02/2009, by S&P to AAA*- on 3/09/2009, by S&P to CCC 8/14/2009, by Moody's to Caa1*- (sf) on 1/14/2010, by S&P to CC (sf) 3/04/2010, by Moody's to Caa3 (sf) on 9/08/2010 and by S&P to D (sf) on 11/23/2011.

(vi)    tranche 1A1 of FHAMS 2006-FA4; issued 6/30/2006; purchased by FNBR on December 19, 2007; downgraded by Moody's to B3 on 1/29/2009, by Moody's to B3*- (sf) on 1/14/2010, by Moody's to Caa3 (sf) pm 9/16/2010.

(vii)   tranche A1 of RALI 2006-QS8; issued 7/28/2006; purchased by FNBR on December 13, 2007; downgraded by S&P to AAA*- on 10/15/2008, by S&P to B on 10/27/2008, by Moody's to Caa2 on 2/26/2009, by S&P to B*- on 3/09/2009, by S&P to CCC on 7/24/2009, by Moody's to Caa3*- (sf) on 1/14/2010, by S&P to CC on 2/16/2010, by S&P to D (sf) 5/25/2010, by Moody's to Ca (sf) on 12/23/2010.

(viii)  tranche A10 of RALI 2006-QS16; issued 11/29/2006; purchased by FNBR on December 18, 2007; downgraded by S&P to B on 10/27/2008, by Moody's to

- 13 -

Caa2 on 2/26/2009, by S&P to B*- on 3/09/2009, by S&P to CCC on 7/24/2009, byMoody's to Caa2*- (sf) on 1/14/2010, by S&P to CC on 2/16/2010, by S&P to D (sf) on 4/19/2010, and by Moody's to Caa3 (sf) on 12/23/2010.

(ix) tranche 2A22 of JPMMT 2007-S1; issued 3/29/2007; purchased by FNBR on December 17, 2007; downgraded by S&P to AA on 8/21/2008, by S&P to A on 10/14/2008, by S&P to A*- on 2/26/2009, by S&P to CCC (sf) on 8/07/2009.

(x) tranche A9 of CWALT 2007-8CB; issued 3/29/2007; purchased by FNBR on December 26, 2007; downgraded by Moody's to B3 on 2/20/2009, by S&P to AAA*- on 3/09/2009, by S&P to CCC (sf) on 6/04/2009, by Moody's to B3*- on 1/14/2010, and by Moody's to Caa3 (sf) on 7/12/2010.

23.    All of the above listed AAA rated Certificates were offered for sale on the condition that they be rated AAA.

24.    FNBR purchased the Certificates for purposes of fulfilling its statutory reserve requirements and would not have purchased the Certificates had they not been rated AAA or at least AA.  FNBR believed that the ratings on the Certificates were accurate and was deceived by the inaccurate and unsupported ratings.  FNBR was further deceived by the omissions by S&P and Moody's to declare their abandonment of their policies, procedures and rigorous modeling and analysis necessary for credible and reliable ratings, and the lack of or impairment of the "integrity, independence, objectivity, transparency, credibility and quality" essential to their ratings.

25.    FNBR has suffered significant losses as a result of the downgrades.

### Defendant Standard & Poor's Ratings Services

26.     Defendant The McGraw-Hill Companies, Inc. ("McGraw-Hill") is a New York corporation.  McGraw-Hill owns Standard & Poor's Financial Services, LLC ("S&P Financial"), which contains as a business unit Standard & Poor's Ratings Services ("S&P").  S&P Financial is a Delaware LLC with its principal office located at 55 Water Street, New York, New York 10041-0003.

27.     Defendant S&P is registered with the Securities and Exchange Commission ("SEC") as a NRSRO.[5]

28.     Defendant S&P describes itself as follows:  "Since beginning its credit rating activities in 1916, Standard & Poor's has rated hundreds of thousands of securities issues, corporate and governmental issuers and structured financings.  Standard & Poor's began its ratings activities with the issuance of credit ratings on corporate and governmental debt issues. Responding to market developments and needs, Standard & Poor's also assesses the credit quality of, and assigns credit ratings to, financial guarantees, bank loans, private placements, mortgage- and asset-backed securities, mutual funds and the ability of insurance companies to pay claims, and assigns market risk ratings to managed funds.

29.     Today, Standard & Poor's has credit ratings outstanding on approximately 150,000 securities issues of obligors in more than 50 countries.  Standard & Poor's rates and monitors developments pertaining to these securities and obligors from operations in 20

---

[5] "Standard & Poor's Ratings Services is comprised of (i) a separately identifiable business unit within Standard & Poor's Financial Services LLC, a Delaware limited liability company wholly-owned by The McGraw-Hill Companies, Inc. ("McGraw-Hill"), formed on November 18, 2008 to house, effective January 1, 2009, certain businesses previously operating as divisions of McGraw-Hill, and (ii) the credit ratings business housed within certain other wholly-owned subsidiaries of, or businesses continuing to operate as divisions of, McGraw-Hill." Application for Registration as a Nationally Recognized Statistical Rating Organization at 3, available at http://bit.ly/JN4Iqb.

countries around the world. With U.S. staff of approximately 1,250 Standard & Poor's rates more than 99.2% of the debt obligations and preferred stock issues publicly traded in the United States.

30.     Standard & Poor's believes that over the last century credit ratings have served the U.S. securities markets extremely well, providing an effective and objective tool in the market's evaluation and assessment of credit risk. Standard & Poor's recognizes the valuable role that credit rating agencies play in the U.S. securities market and is committed to protecting and enhancing the reputation and future of its credit ratings business. In this regard, **Standard & Poor's takes great care to assure that its credit ratings are viewed by the market as highly credible** and relevant and will continue to review its practices, policies and procedures on an ongoing basis and modify or enhance them, as necessary, to ensure that integrity, independence, objectivity, transparency, credibility, and quality continue as fundamental premises of its operations." Testimony of Frank Raiter, former Managing Director, Mortgage-Backed Securities at S&P, before a Joint Hearing of the Subcommittee on Financial Institutions and Consumer Credit and the Subcommittee on Housing and Community Opportunity of the Committee on Financial Services of the U.S. House of Representatives on June 23, 2004, available at http://tinyurl.com/cx6oc8g. ("Raiter Testimony-House Hearing 2004") (emphasis added), at 111-112.

31.     2004 to 2007 were boom years for S&P in terms of the number of RMBS ratings and earnings from that business. "[F]rom 2004 to 2007, S&P issued more than 5,500 RMBS ratings."

**Defendant Moody's Investor Service, Inc.**

32.      Moody's Corporation is the parent company of Moody's Investor Service, Inc., which is a Delaware corporation, registered with the SEC as a NRSRO with its principal office at 7 World Trade Center, 250 Greenwich Street, New York, New York 10007.  Moody's Investors Service, Inc. Annual Certification of Form NRSRO 2011, available at http://bit.ly/HQ6Ufv.

33.      Moody's describes its business as "provid[ing] credit ratings and research covering debt instruments and securities" and that it "is a leading provider of credit ratings, research, and risk analysis."  It further claims that "Moody's commitment and expertise contributes [sic] to transparent and integrated financial markets.  The firm's ratings and analysis track debt covering more than 110 countries, 11,000 corporate issuers, 22,000 public finance issuers, and 94,000 structured finance obligations." *See* http://www.moodys.com/Pages/atc.aspx, accessed May 23, 2012.

34.      In its 2007 Form 10K filed with the Securities and Exchange Commission ("SEC") in March 2007, Moody's describes the breadth of its rating and financial analysis business as follows:  "Moody's Investors Service publishes rating opinions on a broad range of credit obligors and credit obligations issued in domestic and international markets, including various corporate and governmental obligations, structured finance securities and commercial paper programs. It also publishes investor-oriented credit information, research and economic commentary, including in-depth research on major debt issuers, industry studies, special comments and credit opinion handbooks. Moody's credit ratings and research help investors analyze the credit risks associated with fixed-income securities**. Such independent credit ratings and research also contribute to efficiencies in markets** for other obligations, such as

insurance policies and derivative transactions, **by providing credible and independent assessments of credit risk.**

35.     Ratings are disseminated via press releases to the public through a variety of print and electronic media, including the Internet and real-time information systems widely used by securities traders and investors.

36.     Over recent decades, global public and private fixed-income markets have grown significantly in terms of outstanding principal amount and types of securities. While there is potential for periodic cyclical disruption in these developments, Moody's believes that the overall trend and outlook remain favorable for continued secular growth in capital market activity worldwide.  In addition, the securities being issued in the global fixed-income markets are becoming more complex. Moody's expects that these trends will provide continued long-term demand for high-quality, independent credit opinions.

37.     The repackaging of financial assets has had a profound effect on the fixed-income markets. New patterns of securitization are expected to emerge in the next decade. Although the bulk of assets securitized in the past five years have been consumer assets owned by banks, commercial assets — principally commercial mortgages, term receivables and corporate obligations — are now increasingly being securitized. Securitization has evolved into a strategic corporate finance tool in North America, Europe and Japan, and is evolving elsewhere internationally. Ongoing global development of non-traditional financial instruments, especially credit derivatives, has accelerated in recent years. Increasingly complex collateralized debt obligations ("CDO"s) have been introduced, which should continue to support growth. Moody's has introduced new services enabling investors to monitor the performance of their investments

in structured finance, covering asset-backed finance, commercial mortgage finance, residential mortgage finance and credit derivatives." [emphasis added] Moody's Corporation 2007 Form 10K ("Moody's 2007 10K"), filed with the Securities and Exchange Commission ("SEC") on March 1, 2007, at 2-6, link available at: http://1.usa.gov/KHeUpA.

38.     Moody's ratings for RMBS increased dramatically from 2000 through 2007. "Between 2000 and 2007, Moody's rated $4.7 trillion in RMBS." FCIC Draft Report on Rating Agencies at 3. Moody's rated over 4,000 RMBS from 2005 to 2007. PSI at 30.

**S&P and Moody's Status as NRSROs**

39.     S&P and Moody's enjoy the status of NRSRO, a designation conferred by the SEC. Such designation entails disclosure of extensive information to the SEC, the purpose of which is to enable the SEC to determine if ratings are credible and reliable.

40.     "The single most important factor in the Commission staff's assessment of NRSRO status is whether the rating agency is 'nationally recognized' in the United States as an issuer of credible and reliable ratings by the predominant users of securities ratings. The staff also reviews the operational capability and reliability of each rating organization. Included within this assessment are: (1) the organizational structure of the rating organization; (2) the rating organization's financial resources (to determine, among other things, whether it is able to operate independently of economic pressures or control from the companies it rates); (3) the size and quality of the rating organization's staff (to determine if the entity is capable of thoroughly and competently evaluating an issuer's credit); (4) the rating organization's independence from the companies it rates; (5) the rating organization's rating procedures (to determine whether it has systematic procedures designed to produce credible and accurate ratings); and (6) whether

the rating organization has internal procedures to prevent the misuse of nonpublic information and whether those procedures are followed." SEC "Report on the Role and Function of Credit Rating Agencies in the Operation of the Securities Markets, As Required by Section 702(b) of the Sarbanes-Oxley Act of 2002," January 2003 at 9-10, available at http://www.sec.gov/news/studies/credratingreport0103.pdf.

41.     Accordingly, NRSRO implies reliable and credible ratings and affords a rating agency the ability to rate securities, including RMBS, for various regulatory purposes.

## BACKGROUND

### Residential Mortgage Backed Securities

42.     Residential mortgage backed securities, or RMBS, refers to securities that provide fixed periodic payments to investors from pooled residential mortgages. The process of pooling mortgages and converting the pool into an investment is called "securitization." A financial institution, called variously an "arranger," "sponsor," "originator," or "issuer," makes or purchases residential loans that are sold to a newly created trust created solely for the purpose of holding the residential loans and making payments to investors. The trustee purchases the pool of loans from the sponsor with the monies paid by investors, often referred to as certificateholders or bondholders. The trustee collects the loan payments and then distributes the proceeds to certificateholders according to a prioritized payment schedule known as "the waterfall." The waterfall consists of various classes of certificates, or tranches. The waterfall determines the order in which the classes of certificates are paid. Typically, the least risky tranche is rated AAA and receives payment first. Tranches with successively subordinate payment rights typically have increasing risk and higher rates of return. *See* PSI at 18 and 28.

43.     Losses are born by the tranches in reverse order of payment.  Thus the lower tranches absorb losses until their principal is lost and the future expected cash flows in the pool are below that needed to pay the higher tranches.  In effect, the subordination of the lower tranches provides a cushion against losses for the higher tranches.

44.     Another form of protection against loss is known as "over collateralization," which means that the principal amount of the mortgage loans held in the pool exceed the principal amount of the certificates.  In other words, the loans will pay more in principal than the face amount of the certificates.  Any losses in the pool will first be absorbed by the over-collateralization, which usually accrues to the lowest tranche, also known as "the first loss piece" or the "B-piece."  PSI at 27.

45.     An additional form of credit protection is "excess spread," which means that the interest rates on the mortgage loans exceed the interest rates on the certificates and so results in larger interest payments to the trust than are required to make payments to the certificateholders.  All costs and expenses and reserves of the trust are paid out of the excess spread.  Any excess goes to the first loss piece. PSI at 27.

**Issuers Buy Ratings to Facilitate Sales of RMBS.**

46.     Financial institutions that are issuers, or sponsors, of RMBS, such as Countrywide and Washington Mutual, pay credit rating agencies to issue ratings.  They do so because they need investment grade ratings from the RAs to facilitate sales of the certificates, especially to banks, pension funds, insurance companies, university endowments, and municipalities. "Without investment grade ratings, Wall Street firms would have had a more difficult time selling structured finance products to investors because each investor would have had to perform

its own due diligence review of the product. In addition, their sales would have been restricted by federal and state regulations limiting certain institutional investors to the purchase of instruments carrying investment grade credit ratings. Still other regulations conditioned capital reserve requirements on the credit ratings assigned to a bank's investment.

47.     Investment grade credit ratings, thus, purported to simplify the investors' due diligence review, ensured some investors, such as FNBR and members of the putative class, could make a purchase, reduced banks' capital call, and otherwise enhanced the sales of the structured finance products." PSI at 29. In short, sales of RMBS would be impractical without ratings and impossible on the scale to which they rose without ratings.

48.     A former Vice President/Senior Credit Officer at Moody's testified as follows concerning ratings:

> Credit rating agencies serve the important function of providing buyers and sellers of credit – that is, investors in and issuers of a promise to pay – an independent measure of the risk presented. In theory, these agents are independent, and because of repeat experience and a rationalization of costs, are able to provide this measure of risk at a lower cost than would otherwise be faced if the buyers or sellers produced the analysis themselves.     In practice, issuers of debt obligations buy a published rating from a credit rating agency to enable investors to compare the issuer's offering to other debt obligations that also carry a published rating. . . . Structured finance – the ability to raise capital and reduce financing costs through the aggregation and organization of both pre-existing and future obligations – in more ways than one raised the profile and magnified the importance of the rating agencies.

Statement of Richard Michalek, Submitted to Permanent Subcommittee on Investigations, Committee on Governmental Affairs, United States Senate, April 23, 2010 ("Michalek Statement") at 2-3, link available at http://bit.ly/K4ypE0.

## Rating Agencies Publish Ratings to and for Investors

- 22 -

49.     Credit ratings ostensibly assess the risk of repayment.  Investors require ratings of each tranche in a securitization as a way to assess the relative security of certificates in a tranche and to assess the current price.  Certificateholders/investors rely on ratings because they have no access to detailed information about the mortgage loans in the pool or to sophisticated risk assessment tools.

50.     "Market participants relied heavily on the rating agencies when purchasing subprime related assets for at least three reasons.  First, subprime RMBS and their offshoots offer little transparency around the composition and characteristics of the underlying loan collateral. Potential investors are not privy to the information that would allow them to understand clearly the quality of the loan pool. Loan-by-loan data, the highest level of detail, is generally not available to investors. Second, the complexity of the securitization process requires extremely sophisticated systems and technical competence to properly assess risk at the tranche level. Third, rating agencies had a reputation, earned over nearly one century, of being honest arbiters of risk."  Testimony of Jerome S. Fons, a former Managing Director of Credit Policy for Moody's Investor Service, before the Committee on Oversight and Government Reform of the U.S. House of Representatives on October 22, 2008 ("Fons Testimony") at 2, link available at http://bit.ly/LmiB3H.

51.     Moody's President told the SEC "that the primary role of rating agencies and ratings is to enhance the efficiency and transparency of debt capital markets and *__to protect investors.__*" [emphasis added]   Written statement of Raymond W. McDaniel, President of Moody's Investors Service, before the SEC, November 21, 2002, available at http://www.sec.gov/news/extra/credrate/moodys.htm.

- 23 -

52.     S&P is similarly explicit about ratings being for investors.  *"Ratings exist first and foremost to provide investors with an independent view of creditworthiness."* [emphasis added] Standard & Poor's Ratings Direct, "An Examination Of How Investor Needs Are Served By Various Ratings Business Models: Ensuring Analytical Independence And Preventing Conflicts Of Interest At Credit Rating Firms" ("Ratings Direct 4/10/2009"), April 10, 2009, at 3, available at http://bit.ly/KPIMz8.  "One of the reasons ratings firms play a valuable role is that it is impossible for all but the very largest investing institutions to perform independent analysis of a large number of issuing institutions and myriad debt securities."  *Id.*  "Standard & Poor's constantly seeks to better understand the needs of investors where credit ratings are concerned" and met with various investors and other parties to ask what they wanted from ratings firms.  The response was "analytical independence," transparent and efficient markets with freely available ratings, no conflicts of interest and independence from issuers, "*[h]igh quality ratings based on sound, consistently applied methodologies that take into account real-world trends,*" broad coverage of securities, "*[o]ngoing scrutiny to ensure that a rated security will be surveilled over time and upgraded or downgraded if appropriate and in a timely manner*," and multiple options for ratings opinions.  Ratings Direct 4/10/2009 at 3-4 (emphasis added).

53.     The foregoing demonstrates that the RAs clearly intended that investors such as FNBR to rely on their ratings when making investment decisions.  The RAs publish their ratings knowing and intending that investors will rely on them.

**AAA Ratings and NRSRO Status Are Essential to Sell to Community Banks**

54.     Federal regulations require that banks hold a certain amount of capital in reserve. Mortgage backed securities can be used as part of that reserve.  The Secondary Mortgage Market

Enhancement Act ("SMMEA"), enacted in 1984[6], declared NRSRO rated AAA and AA mortgage-backed securities to be legal investments equivalent to treasuries and other federal government bonds for federal and state financial institutions.[7] *See* 15 U.S.C. §§ 77r-1(a) and 78c(a)(41). Federal regulations for national banks afford RMBS similar status. *See* 12 U.S.C. 1 *et seq.*, 12 U.S.C. §§ 24(Seventh); and http://ecfr.gpoaccess.gov/cgi/t/text/text-idx?c=ecfr&sid=80070591f26e9f53c3e993f3cf836707&rgn=div9&view=text&node=12:1.0.1.1. 3.5.4.9.1&idno=12.

55. Investment grade bonds can be counted for reserve purposes at book value. Bonds below investment grade must be valued at a discount to book value. In 2002, United States bank regulators enacted rules "that reduced capital reserves for securitized mortgages. RMBS holdings also became increasingly attractive to banks, which could determine how much capital they needed to hold based on the credit ratings their RMBS securities received from the credit rating agencies." PSI at 18. The rules assigned risk weights for RMBS according to ratings. "Risk weights for bonds rated AAA or AA were below weights for lower-rated bonds. Institutions were required to hold capital in proportion to the risk weights. For example, relative to the required capital for AAA or AA securities, BBB securities required five times greater capital and BB securities required ten times greater capital." FCIC Draft Report on Rating Agencies at 5-6.

---

[6] Pub. L. 98-440, Sec. 1, Oct. 3, 1984, 98 Stat. 1689, provided: "That this Act [enacting section 77r-1 of Title 15, Commerce and Trade, and amending sections 24, 1451, 1454, 1455, 1464, 1717, 1723, 1723a, 1723c, and 1757 of this title and sections 78c, 78g, 78h, and 78k of Title 15] may be cited as the 'Secondary Mortgage Market Enhancement Act of 1984'."

[7] Congress passed SMMEA to encourage development of a market for private-label (non-government agency) mortgaged backed securities. SEC, Treasure, Office of Federal Housing Enterpise Oversight, "Staff Report: Enhancing Disclosure in the Mortgage-Backed Securities Markets" (January 2003) at 8, available at http://www.sec.gov/news/studies/mortgagebacked.htm#seciv.

56.     "Because so many federal and state statutes and regulations required financial institutions to hold securities with investment grade ratings, the credit rating agencies were not only guaranteed a steady business, but were encouraged to issue AAA and other investment grade ratings. Issuers of securities and other financial instruments also worked hard to obtain favorable credit ratings to ensure more investors could buy their products."  PSI at 27.

57.     Not surprisingly, Moody's targeted banks as investors which it knew relied on its ratings:  "Moody's will continue to provide banks and other institutions with quantitative credit risk assessment services. Moody's believes that there will be increased demand for such services because they assist customers trading or holding credit-sensitive assets to produce better performance. Also, recent proposals by international bank regulatory authorities to recognize banks' internal credit risk management systems for the purpose of determining regulatory capital are expected to encourage adoption of such services by banks from third-party providers. Moody's also expects to provide extensions to existing services and new services, such as valuations of credit-sensitive assets."  Moody's 2007 10K at 6.

58.     S&P does likewise.  Both Moody's and S&P know that banks must rely on their AAA or AA ratings and that even if the banks could do their own due diligence, the banks must still buy certificates with the AAA or AA rating to satisfy regulatory requirements.  Thus, community banks, including FNBR and the putative class members, relied, and must rely, on Moody's and S&P's ratings.  Indeed, Moody's and S&P intend for banks to rely on their ratings.

**The Initial Ratings Process**

59.     The financial institutions that create RMBS offerings pay S&P and Moody's to produce ratings.  Not surprisingly, the financial institutions, or issuers/sponsors, want the

- 26 -

maximum principal amount that can be rated AAA because that tranche, or tranches, is/are the most profitable for the sponsor. PSI at 278. The issuer/sponsor often obtains shadow ratings from the RAs and chooses the most generous RA to rate the deal. PSI at 254, 272-73, 278-9, 287-88. The RAs determine the principal amount and rating in each successively lower rated tranche in negotiation with the sponsor. PSI at 254. The investors pay money for certificates at the offering, which money goes to the issuer creating the RMBS securitization and out of which the issuer recovers the fees paid to the rating agencies.

60.     "When Standard & Poor's issues a rating, it is offering its opinion about a company's medium to long-term credit risk. Similarly, ratings on particular instruments, such as the securities related to structured finance transactions, reflect Standard & Poor's opinion about the likelihood of default on those securities. In determining all of its ratings, Standard & Poor's tries to take into account whatever relevant future events may be anticipated." Raiter Testimony-House Hearing 2004 at 112.

61.     "Moody's ratings [  ] are a measure of the 'expected loss' facing an investor, given the tenor of the instrument. The determination of expected loss includes making an estimate of both the probability of a default in the promised payment, and the severity of the loss experienced given such a default."   Michalek Statement at 2.

62.     While the rating agencies do not formally investigate the information from issuers/sponsors for fraud, they do, or are supposed to, "maintain a healthy degree of skepticism" in evaluating that information and adjusting ratings accordingly or, in extreme circumstances, refuse to issue a rating or withdrawing an outstanding rating. *See* Written Statement of Raymond W. McDaniel, President, Moody's Investors Service, before the SEC on November 21, 2002,

available at http://www.sec.gov/news/extra/credrate/moodys.htm.

63.     However, Moody's does not perform due diligence to verify the information

provided to it about the loans in an RMBS.  As Moody's explained:

> [T]he accuracy of the information that we [Moody's] receive is
> central in importance to our analysis.  And we rely on the work of
> other parties to verify and establish the accuracy of that
> information. So, first of all, it is primarily the responsibility of the
> issuer and the loan originator to provide information to rating
> agencies and others that is accurate.    Furthermore, the
> underwriters, the investment bankers who market the securities
> have an obligation to perform due diligence on the loans included
> in the securitization. And, finally, information presented in the
> offering documents associated with those securities is vetted by
> accounting firms. And so I agree that the accuracy of the
> information is very important, but there are others whose role it is
> to check and verify that information.

Testimony of Ms. Claire Robinson, Senior Managing Director, Moody's Investors Service,

before the Senate Committee on Banking, Housing, and Urban Affairs on "Issues Involving the

Rating of Structured Finance Instruments by the Nationally Recognized Statistical Rating

Organizations . . ." on April 22, 2008, available at http://tinyurl.com/btftlmf.

64.     S&P also does not verify the information about the loans in an RMBS.

**Surveillance and Ongoing Ratings**

65.     "Following an initial credit rating, both Moody's and S&P conducted ongoing

surveillance of all rated securities to evaluate a product's ongoing credit risk and to determine

whether its credit rating should be affirmed, upgraded, or downgraded over the life of the

security.  Both used automated surveillance tools that, on a monthly basis, flagged securities

whose performance indicated their rating might need to be adjusted to reflect the current risk of

default or loss. Surveillance analysts investigated the flagged securities and presented

recommendations for rating changes to a ratings committee." PSI at 255. *See also* PSI at 31; FCIC Preliminary Staff Report at 20.

66.     As per Moody's, "[t]he market utility of a credit rating system is highest when ratings effectively distinguish riskier credits from those that are less risky, when they do so on a comparable basis across a wide range of issuers, and when the ratings are widely disseminated. Stability of ratings is also valued in the market, and Moody's manages its ratings so that they are changed only in response to changes in relative credit risk that we believe will endure, rather than in response to transitory events or shifts in market sentiment." Testimony of Raymond W. McDaniel, Jr. before the U.S. Senate Committee on Banking, Housing and Urban Affairs on February 8, 2005 ("McDaniel 2005 Testimony"), at 4, available at http://1.usa.gov/Laujum.

67.     Moody's surveillance department typically receives "updated loan performance statistics on a monthly basis for the collateral pools of the transactions it has rated.'" *See* PSI at 291, n. 1127

68.     Susan Barnes, Managing Director of Residential Mortgage-Backed Securities for S&P, testified before Congress on April 17, 2007 that S&P, in addition to issuing initial ratings, "monitors ratings on an ongoing basis" "to ensure that the rating continues to reflect our credit opinion based on our assumption of the future performance of the transactions," which is based upon S&P's "assessment of risks to the transaction." Testimony of Susan Barnes Submitted to the Subcommittee on Securities, Insurance and Investment, U.S. Senate Banking, Housing and Urban Affairs Committee, "Subprime Mortgage Market Turmoil: Examining the Role of Securitization ("Barnes Testimony"), at 2, 6, available at http://1.usa.gov/KgQ2zm. The "surveillance process" includes "identify[ing] those issues that should be reviewed for either an

upgrade or a downgrade because of asset pool performance that may differ from the original assumptions." *See* Barnes Testimony at 11.

69.     S&P also receives updated information directly from an RMBS trustee on a continuous basis, as well as information from third parties, that it uses to assess the continued validity of ratings. Standard & Poor's Rating Services, U.S. Securities and Exchange Commission Public Hearing, "Role and Function of Credit Rating Agencies in the U.S. Securities Markets," November 15, 2002, at 2, 3-4 available at http://www.sec.gov/news/extra/credrate/standardpoors.htm.

70.     The RAs "were obligated by contract to conduct ongoing surveillance of the RMBS . . . they rated to ensure the ratings remained valid over the life of the rated securities." Fees for surveillance were charged annually or upfront.    PSI at 256, 297.

71.     Due to the huge numbers of RMBS and CDO securities issued in the years leading up to the financial crisis, those surveillance divisions were responsible for reviewing tens of thousands of securities. The issue of whether to retest the outstanding securities using the revised credit rating models was, thus, a significant issue affecting numerous securities and substantial company resources.  PSI at 297.

72.     Surveillance fees were an expense paid at the initial rating or annually.  PSI at 256.  Such expense was indirectly paid out of the purchase price of certificates.  In other words, the investors paid for the ratings.

**Ratings Include Non-Public Information**

73.     Moody's President explained that ratings include confidential information not available to investors.

Although issuers are not obliged to provide information to us, in most instances they have proven to be an important source of input for our rating opinions. Our ability to consider sensitive information judiciously, and not to unnecessarily reverse ratings over short periods of time because we are "surprised" by new information, is highly valued by most market participants, including many regulatory bodies. Consequently, it is important that issuers be given the opportunity to discuss their business with us in an unfettered manner. For example, if issuers feel that they are prohibited from having confidential or hypothetical "what if" discussions with Moody's, we will be less informed, we will provide less timely market evaluations, and we will inevitably be more reactive and less considered in our rating analysis. Such reactiveness in ratings would increase volatility and decrease transparency in the capital market.

Issuers have historically been able to provide non-public information to rating agencies for the purposes of assigning or maintaining a rating. Recently, Regulation Fair Disclosure (Reg. FD) expressly permitted issuers to continue to discuss confidential information with us.[12] As a result, our ratings at times incorporate information that is not public. In such circumstances, we do not disclose the actual non-public information itself. Rather, if in our opinion the non-public information impacts the risk profile of an issuer or a debt instrument, it will be reflected only in our public rating. Our underlying motivation is to strike an appropriate balance between receipt and preservation of confidential information (allowing judicious rating decisions), with serving market efficiency, transparency and investor protection by providing an independent and up-to-date risk assessment.

Written statement of Raymond W. McDaniel, President of Moody's Investors Service, before the SEC, November 21, 2002, available at http://www.sec.gov/news/extra/credrate/moodys.htm.

74. Investors know that ratings often include non-public information and so rely on the ratings because the ratings ostensibly include more information than an investor could glean from its own due diligence.

**The Meaning of Various Ratings**

75. The ratings from different agencies measure slightly different credit risk

characteristics. S&P and Fitch, for example, base their ratings on the probability of default. Moody's, in contrast, bases its ratings on *expected loss*, which is equal to the product of (1) the probability of default and (2) the proportion of the investment that investors on average lose in the event of default. Investors and regulators, however, tend to view the ratings of the major RAs as roughly equivalent. Table 1 shows the rating scales of Moody's, S&P, and Fitch by credit quality category. The ratings are divided into two categories: bonds rated BBB- and above are considered *investment grade*; bonds rated below BBB- are *speculative grade* (sometimes also called *junk*). When rating a structured product like an RMBS or CDO, the RAs estimate the probability of default or expected loss of the bond and compare it to benchmarks for each of their ratings. The five-year expected loss benchmarks for Moody's ratings are in Appendix 1. The expected loss over five years on a bond that Moody's rates Aaa is less than 0.0016%, which for a $1 million bond amounts to $16. For a bond rated Baa1 it is less than 0.605%, which for a $1 million bond amounts to $6,050.

**Table 1:  Meaning of Credit Ratings**
**Credit Rating Agency**

| Credit Quality | *Moody's* | *S&P* | *Fitch* |
|---|---|---|---|
| *Investment grade* | | | |
| Highest credit quality | Aaa | AAA | AAA |
| High credit quality | Aa1 to Aa3 | AA+ to AA- | AA |
| Strong payment capacity | A1 to A3 | A+ to A- | A |
| Adequate payment capacity | Baa1 to Baa3 | BBB+ to BBB- | BBB |
| *Speculative grade* | | | |
| Possibility of credit risk | Ba1 to Ba3 | BB+ to BB- | BB |
| Significant credit risk | B1 to B3 | B+ to B- | B |
| High credit risk | Caa1 to Caa3 | CCC+ to CCC- | CCC |

**Table 1:  Meaning of Credit Ratings**
**Credit Rating Agency**

| Credit Quality | *Moody's* | *S&P* | *Fitch* |
|---|---|---|---|
| Default is likely/ imminent | Ca | CC, C | CC, C |
| In default | C | SD, D | D |

Financial Crisis Inquiry Commission, Preliminary Staff Report, Credit Ratings and the Financial Crisis, June 2, 2010 ("FCIC Draft Report on Rating Agencies") at 4-5, available at http://bit.ly/Kj3x3g.

76.     Prior to the meltdown in 2007-2008, AAA-rated certificates traditionally had a less than 1% probability of default.  PSI at 6.  "For example, S&P reported that its cumulative RMBS default rate by original rating class (through September 15, 2007) was 0.04% for AAA initial ratings and 1.09% for BBB.  Financial instruments bearing AAA through BBB- ratings are generally called 'investment grade,' while those with ratings below BBB- (or Baa3) are referred to as 'below investment grade' or sometimes as 'junk' investments. Financial instruments that default receive a D rating from S&P, but no rating at all by Moody's."  PSI at 247.

77.     As one analyst from Moody's put succinctly: "a Triple-A rating describes assets that 'should survive the equivalent of the US Great Depression, undoubtedly with downgrades but with no loss to Aaa holders."  *Abu Dhabi Commercial Bank, et al. v. Morgan Stanley & Co. Inc., et al.,* No. 08 Civ. 7508 (SAS) (S.D.N.Y. Aug. 17, 2012) at 40, available at http://newsandinsight*Abu*.thomsonreuters.com/uploadedFiles/Reuters_Content/2012/08_-_August/abudhabi--SJopinion.pdf.

## FACTS

### Riskier Loans Increased, Underwriting Weakened, Defaults Rose – the RAs knew.

78.     To feed the securitization machine and investor desires for AAA-rated investments, and to generate higher fees, mortgage brokers and investment bankers created a pipeline of low-quality, high risk residential loans that were pooled and sold to investors. In fact, AAA rated securities backed by high risk, subprime loans were more profitable than AAA rated securities backed by less risky loans.  PSI at 18-20, 25.  The credit rating agencies participated by awarding AAA-ratings to certificates backed by subprime loans without adjusting their ratings to account for the additional risk, in particular the widespread decline in underwriting standards.   As Professor Coffee explained in his testimony:

> Prior to 2005, subprime mortgage loans represented roughly 10% of outstanding mortgage loans. By 2006, the origination of subprime mortgages rose to account for 20% of new residential mortgages (compared to an historical average of 8%). Traditionally, lenders required the mortgage borrower to make at least an 80% down payment on the purchase price of the home. Beginning around 2005, subprime borrowers were offered "80/20" mortgage loans – consisting of an 80% first mortgage and a 20% second mortgage – to finance 100% of the home. Many of these mortgages also had a "short reset" provision which provided for a below market initial interest rate that would later be reset to a typically higher market rate. In effect, the initial interest rate was a marketing teaser. Add to this picture the factors that short-term interest rates began to rise from mid-2004 on (from near record low levels) and that housing prices had either stalled or already begun to sink, and the stage was set for disaster as adjustable rate mortgages began to reset upward.

> More generally, spurred by the worldwide insatiable demand of institution investors for investment grade rated structured finance products, underwriting standards on mortgage loans began to deteriorate. The loosening of mortgage loan standards was first noted by the Office of the Comptroller of the Currency in its 2005 "Survey of Credit Underwriting Practices." Not only were lenders

- 34 -

requiring little or no equity investment, but to increase "affordability," they came to require less and less documentation of income. Such undocumented loans – known popularly as "liar loans" – rose to account for 40 percent of subprime mortgage loans in 2006, up from 25 percent in 2001. By early 2007, journalists had begun to give prominent attention to these problems. *See* P. Coy, "Why Subprime Lenders Are in Trouble," Business Week, March 2, 2007.

Obviously, for a borrower having no equity stake in his or her home (as a result of 100% financing) and facing rising interest rates and declining housing prices, default becomes rational. This is especially the case in state jurisdictions which bar any deficiency judgment – so that foreclosure and loss of the home is the only penalty for default. Indeed, once housing prices begin to fall, it becomes increasingly hard to justify paying back a mortgage at an increasing interest rate to own a home with a current market value lower than the total non-recourse mortgage debt.

None of these obvious facts were lost on the ratings agencies, which began to issue warnings about the deteriorating state of the subprime market in mid-2006. By the end of 2006, Moody's publicly announced that the documentation problems on subprime mortgages was becoming more serious.

*See* Coffee Testimony at 6-8.

79.     In 2004, the FBI warned of increasing mortgage fraud.  In 2006, it reported that Suspicious Activity Reports on mortgage fraud had increased sixfold and convictions for mortgage fraud were up 131%.  PSI, Exhibit #1a at 9, available at http://bit.ly/M9OEQk.

80.     The FDIC warned in 2004 of increased delinquencies from subprime loans and other non-prime loans.  PSI at 270-71.

81.     Prospectus supplements for the deals at issue rated by S&P and Moody's disclosed that underwriting was lax and warned of more defaults.  By way of example the Prospectus Supplement for RALI 2006-QS8 provides:

Based on the data provided in the application and certain

verifications, if required, a determination is made by the original lender that the mortgagor's monthly income, if required to be stated, will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations. Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months, including those mentioned above and other fixed obligations, must equal no more than specified percentages of the prospective mortgagor's gross income. The originator may also consider the amount of liquid assets available to the mortgagor after origination.

Certain of the mortgage loans [sic] have been originated under "reduced documentation" or "no stated income" programs, which require less documentation and verification than do traditional "full documentation" programs. Generally, under a "reduced documentation" program, no verification of a mortgagor's stated income is undertaken by the originator. Under a "no stated income" program, certain borrowers with acceptable payment histories will not be required to provide any information regarding income and no other investigation regarding the borrower's income will be undertaken. Under a "no income/no asset" program, no verification of a mortgagor's income or assets is undertaken by the originator. The underwriting for those mortgage loans may be based primarily or entirely on an appraisal of the mortgaged property and the LTV ratio at origination.

The adequacy of the mortgaged property as security for repayment of the related mortgage loan generally is determined by an appraisal in accordance with appraisal procedure guidelines described in the Seller Guide. Appraisers may be staff appraisers employed by the originator. The appraisal procedure guidelines generally require the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property is in good condition and that construction, if new, has been substantially completed. The appraiser is required to consider a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property, or replacement cost analysis based on the current cost of constructing or purchasing a similar property. In certain instances, the LTV ratio is based on the appraised value as indicated on a review appraisal conducted by the mortgage

collateral seller or originator.

Prior to assigning the mortgage loans to the depositor, Residential Funding will have reviewed the underwriting information provided by the mortgage collateral sellers for the mortgage loans and, in those cases, determined that the mortgage loans were generally originated in accordance with or in a manner generally consistent with the underwriting standards described in the Seller Guide. With regard to a material portion of these mortgage loans, this review of underwriting information by Residential Funding was performed using an automated underwriting system. Any determination described above using an automated underwriting system will only be based on the information entered into the system and the information the system is programmed to review. . . .

Because of the program criteria and underwriting standards described above, the mortgage loans may experience greater rates of delinquency, foreclosure and loss than mortgage loans required to satisfy more stringent underwriting standards.

RALI 2006-QS8 Prospectus Supplement, Form 424b5, dated July 25, 2006 and filed with

the SEC on July 27, 2006, at S-42 – S-43, available at http://1.usa.gov/Ky0Xek.

82.     Mortgage delinquencies and defaults began rising in 2006 and, in the beginning,

seemed to be "concentrated in subprime mortgages that had been originated in 2005 and 2006."

Preliminary Report at 26-27.

83.     Moody's observed higher risk factors in subprime loans in 2002, which continued

through at least 2006.  It also published multiple reports on the deterioration of underwriting

standards beginning in July 2003.   On January 18, 2007, Moody's reported on increasing

defaults for subprime loans made in late 2005 and 2006.  Testimony of Raymond W. McDaniel,

Chairman and Chief Executive Officer of Moody's Corporation and Yuri Yoshizawa, Senior

Managing Director, Moody's Investors Service, before the Unites States Senate Permanent

Subcommittee on Investigation, April 23, 2010 ("McDaniel Testimony"), at 17-18, hyperlink

available at http://bit.ly/K4ypE0; Preliminary Report at 27. In subsequent reports on March 7, March 23 and April 20, 2007, Moody's warned of deteriorating loan performance in vintage 2006 subprime loans. Preliminary Report at 27-28.

84.     S&P internal emails from 2006 reveal knowledge of deterioration in RMBS in more colorful terms. *See* PSI Exhibit #1a at 9. One S&P employee spoke of increased fraud: "I'm not surprised, there has been rampant appraisal and underwriting fraud in the industry for quite some time as pressure has mounted to feed the origination machine." *Id.* at 9, n.29, email from S&P employee, 8/8/06. S&P SEC-E 31894.htm. Another wrote: "'I think it's telling us that underwriting fraud; appraisal fraud and the general appetite for new product among originators is resulting in loans being made that shouldn't be made.' A colleague responded that the head of the S&P Surveillance Group 'told me that broken down to loan level what she is seeing in losses is as bad as high 40's—low 50%  I'd love to be able to publish a commentary with this data but maybe too much of a powder keg.'" *Id.* at 9-10 and n. 30; email from S&P employee, 9/26/06, S&P-SEC-E 333308.

85.     S&P's awareness of the increased delinquencies and defaults in April 2007 caused it to predict losses for 2006 subprime loans and more negative rating actions. S&P attributed part of the poor performance of subprime loans to lax underwriting. Barnes Testimony at 13.

### Home Prices Declined and Vacancy Rates Increased—the RAs Knew

86.     From a variety of sources, the credit rating agency defendants knew in 2006 and 2007 that home prices were declining. One source was Moody's own Chief Economist. Mark Zandi, at Economy.com, a separate subsidiary. In October, 2006, Mark Zandi noted that "the

U.S. Housing market downturn is in full swing" and predicted that 20 major metropolitan areas would "experience a crash in house prices: a double-digit peak-to-trough decline in house prices" and some 100 others were already experiencing housing price declines or would do so within a short time. He further predicted that prices would decline into 2008 and 2009. Moody's Economy.com, "Housing at the Tipping Point The Outlook for the U.S, Residential Real Estate Market" ("Zandi Report"), available at http://bit.ly/M9PgVZ.

87.     Another source of information about declining home prices was the news media. On September 25, 2006, CNN Money.com report that home prices had dropped for the first time in 11 years. Isidore, Chris, "Home prices: 1st drop in 11 years," available at http://cnnmon.ie/LscJoj. On July 7, 2007, CNNMoney.com reported that home prices had dropped for three quarters. Christie, Les, "Home Prices drop for third straight quarter," available at http://cnnmon.ie/Mm2Jtm. On August 26, 2007, The New York Times reported that home prices were expected to fall and that Moody's Economy.com predicted that the national median price of homes "is not likely to return to its 2007 peak for more than a decade." Leonhart, David and Bajaj, Vikas, "Drop Foreseen in Median Price of U.S. Homes," available at http://nyti.ms/JNcRe8.

88.     Courtesy of the federal government, the RAs also had access to statistical data showing that in 2006 the vacancy rates in homes were increasing along with the decline in home prices, indicating more defaults on residential loans. *See* U.S. Census Bureau News, April 27, 2011, Table 1, "Rental and Homeowner Vacancy Rates for the United States: 1996 to 2011 (in percent)," available at http://1.usa.gov/j9wepP.

89.     An October 2006 S&P internal email shows awareness that increasing vacancies

were a problem: "'Pretty grim news as we suspected-note also the "mailing in the keys and walking away" epidemic has begun-I think things are going to get mighty ugly next year!'" PSI Exhibit #1a at 10.

### RAs Knew Their Models and Ratings Were Inaccurate; RA Models Were Based on Inappropriate Data.

90.     "Credit rating models are mathematical constructs that analyze a large number of data points related to the likelihood of an asset defaulting.  RMBS rating models typically use statistical analysis of past mortgage performance data to calculate expected RMBS default rates and losses."  Both the S&P model and the Moody's model "used large amounts if statistical data related to the performance of residential mortgages over time to develop criteria to analyze and rate submitted mortgage pools.  [RA] analysts relied on these quantitative models to predicts expected loss (Moody's) or the probability of default (S&P) for a pool of residential loans."  PSI at 252.

91.     As noted above, the RA models failed in assessing the credit risk of subprime RMBS because the models "compared apples to oranges"; the models relied on historical residential mortgage performance, most of which were prime, 30-year mortgages, to predict how subprime RMBS securities would behave.  From 2004 through 2007, many RMBS [ ] securities were comprised of residential mortgages that were not like those that had been modeled in the past.  As an S&P email contained the following observation:  "'The assumptions and the historical data used in the models never included the performance of these types of residential mortgage loans.  The data was gathered and computed during a time when loans with over 100% LTV or no stated income were rare.'  In contrast to decades of actual performance data for 30-year mortgages with fixed interest rates, the new subprime, high risk products had little to no

- 40 -

track record to predict their rates of default. . . . The absence of relevant data for use in RMBS modeling left the credit rating agencies unable to accurately predict mortgage default and loss rates when housing prices stopped climbing." PSI at 288-9.

92.     The inappropriateness of the models was confirmed by the fact that "[b]y January 2007, nearly 10% of all subprime loans were delinquent, a 68% increase from January 2006." PSI at 263.

### Other Flaws in Moody's Model and Ratings Criteria

93.     "Moody's RMBS rating model was not even used to rate subprime mortgages until December 2006; prior to that time, Moody's used a system of 'benchmarking' in which it rated a subprime mortgage pool by comparing it to other subprime pools Moody's had already rated." PSI at 289. *See also* Examination Report for Moody's Investor Services, Inc. at 3, available at http://fcic-static.law.stanford.edu/cdn_media/fcic-testimony/2010-0602-sec-ocie-report.pdf. Interestingly, Moody's apparently had one or more models to use in rating RMBS. *See* Moody's, "Collateral Analysis and Other Considerations in Rating of RMBS Securities," October 4, 2006, at 11, 18, 20, 42-53.

94.     Prior to December 2006, Moody's did not include any adjustment in RMBS ratings for "the quality of originators and servicers of the loans included in a pool." As of December 2006, Moody's adjusted its loss levels calculations by up to 20% if the loans in a pool were made by an originator "known for issuing poor quality loans or servicers known for providing poor quality servicing." PSI at 252.

95.     Without any apparent basis, the Moody's model assumed "that house prices would appreciate 4% each and every year for 45 years," which was "the legal life of a

- 41 -

transaction." Harrington Letter at 38, 48. "In-use methodologies may keep ratings stagnant, in which case the ratings assigned at issuance will appear to have been 'correct.'" Harrington Letter at 39. Further, as noted above, Moody's did not exercise skepticism with regard to the loan pool data it received from issuers despite knowledge of fraud, poor underwriting and deterioration in RMBS performance.

**Other Flaws In S&P's model**

96. S&P did not adjust its ratings for RMBS with loans from poor quality originators or with poor servicers until November 2008. PSI at 252-3 and n. 977.

97. S&P did not exercise appropriate skepticism in evaluating the loan data provided by an issuer/sponsor for an RMBS despite knowledge of widespread fraud, poor underwriting and deterioration in subprime RMBS performance.

**RAs Knew Their Ratings Lacked Proper Support**

98. The foregoing demonstrates that the RAs knew that there was no credible basis for their ratings for subprime RMBS. This was especially evident by early 2007 as the poor performance of subprime RMBS came to light.

99. A Moody's Managing Director acknowledged its ratings of subprime and other non-prime RMBS in 2007 were inaccurate.

> During the course of the year [2007], the group which rated and monitored subprime bonds did not react to the deterioration in their performance statistics. That changed by the late summer of 2007. In early September, I was told that the ratings on the 2006 vintage of subprime bonds were about to be downgraded severely. While the understaffed group needed time to determine the new ratings, I left the meeting with the knowledge that the then current ratings were wrong and no longer reflected the best opinion of the rating agency.

Testimony of Eric Kolchinsky, a former Managing Director at Moody's before the Senate Permanent Subcommittee on Investigations at a hearing on "Wall Street and the Financial Crisis: The Role of Credit Rating Agencies," on April 23, 2010 ("Kolchinsky Testimony") at 2-3., link available at http://tinyurl.com/cqypnxn.

100. Similarly, S&P was aware that subprime RMBS carried higher risk than its ratings disclosed. S&P developed successive and more comprehensive versions of its RMBS rating model; in late 2003 or early 2004, S&P had developed a model based on the performance of some 9.5 million loans and which covered "the full spectrum of new mortgage products," including Alt-A and fixed/floating payment loans. Yet, the model was not implemented as of October 2008. Written Statement of Frank L. Raiter on "Credit Rating Agencies and the Financial Crisis" before the Committee on Oversight and Government Reform, U.S. House of Representatives on October 22, 2008 ("Raiter 2008 Statement"), at 5, available at http://tinyurl.com/d3m9tt5.

101. S&P also knew that its rating model was flawed and that S&P had rated deals on insufficient data. *See Abu Dhabi Commercial Bank, et al. v. Morgan Stanley & Co. Inc., et al.,* No. 08 Civ. 7508 (SAS) (S.D.N.Y. Aug. 17, 2012) at 50, n. 179.

102. Further, S&P knew as early as 2004 that many residential loans were too large for the borrower's to repay and that there were other predatory lending practices that made subprime and other non-prime loans risky and that default rates were increasing: "Increased access to mortgage loans has led to increased homeownership across the United States. While this growth in homeownership is positive, it has become evident that some of this increase has unfortunately occurred simultaneously with the rise in predatory lending practices. Among others, these

- 43 -

predatory practices include the following: charging excessive interest or fees; making a loan to a borrower that is beyond the borrower's financial ability to repay; charging excessive prepayment penalties; encouraging a borrower to refinance a loan notwithstanding the lack of benefit to the borrower; and increasing interest rates upon default." Raiter Testimony-House Hearing 2004 at 16-17.

103.    Still further, the Permanent Subcommittee found that the RAs refused to retest their existing ratings even after they devised models in 2006 that were designed to more accurately rate subprime RMBS. PSI at 297. Thus, the RAs knew in early 2007 and thereafter that their existing ratings were inaccurate when issued and continued to be so.

**Moody's and S&P Denied The Need for Corrective Re-Ratings**

104.    Despite all the foregoing knowledge of inaccurate ratings models, fraud, abysmal underwriting, falling home prices, deteriorating performance, increased risk factors in loans, increasing delinquencies, defaults and vacancies, and especially in light of the warnings from issuers in their prospectus supplements, S&P and Moody's continued to assign AAA ratings to newly issued subprime RMBS until mid-July 2007. "In the first week of July 2007, S&P issued over 1,500 new RMBS ratings, a number that almost equaled the average number of RMBS ratings is issued in each of the preceding three months. From July 5 to July 11, 2007, Moody's issued approximately 675 new RMBS ratings, nearly double its weekly average in the prior month." PSI at 263.

105.    S&P and Moody's also refused to correct the inflated AAA rated certificates for already issued subprime certificates. Moody's went so far as to say re-ratings were not justified:

> In our March 2007 report, "Challenging Times for the US
> Subprime Mortgage Market," Moody's said that: "In response to

- 44 -

the increase in the riskiness of loans made during the last few years and the changing economic environment, Moody's has steadily increased its loss expectations on pools of subprime loans." However, Moody's also identified a number of factors that we believed would be critical in determining the ultimate performance of these loans. In relevant part, the report said: **"It is generally too early to predict ultimate performance for the subprime mortgage loans originated in 2006 and the bonds secured by such loans. A number of factors will determine the ultimate losses. Home price appreciation and refinancing opportunities available in the next few years are expected to have the biggest impact. Economic factors, such as interest rates and unemployment, will also play a significant role as will loss mitigation techniques employed by loan servicers."**

McDaniel Testimony at 19 (emphasis added).

106.    S&P also denied the need for any downgrades despite its knowledge of problems with subprime loans.  On April 17, 2007, S&P's Susan Barnes testified that, "[b]etween 1978 and 2006, S&P issued 46,912 RMBS ratings. 85% were initially rated investment grade: AAA to BBB. Of the $3.6 trillion in par value of RMBS outstanding as of January 1, 2007, 88.1% are rated AAA. In general, then, the vast majority of residential mortgage-backed securities ratings have been investment grade and very stable. S&P believes its models have captured the deterioration in the credit quality of the 2006 subprime mortgage loans."  Barnes Testimony at 12.  Barnes further opined that home price declines would be "minor" in 2007 and with interest rates and unemployment at historical lows, "there is sufficient protection for the majority of investment grade bonds."  Barnes Testimony at 13.

107.    The report issued by the Senate Permanent Subcommittee on Investigations confirmed that Moody's and S&P "fiddled while Rome burned."

Evidence gathered by the Subcommittee shows that the credit rating agencies were aware of problems in the mortgage market, including an unsustainable rise in housing prices, the high risk

- 45 -

> nature of the loans being issued, lax lending standards, and rampant mortgage fraud. Instead of using this information to temper their ratings, the firms continued to issue a high volume of investment grade ratings for mortgage backed securities. If the credit rating agencies had issued ratings that accurately reflected the increasing risk in the RMBS and CDO markets and appropriately adjusted existing ratings in those markets, they might have discouraged investors from purchasing high risk RMBS and CDO securities, and slowed the pace of securitizations.

PSI at 7.

108. "Even though S&P and Moody's had independently revised their RMBS models and, by 2006, determined that additional credit enhancements of 30-40% were needed to protect investment grade tranches from loss, in 2006 and the first half of 2007, neither company used its revised models to evaluate existing rated subprime RMBS securities as part of its surveillance efforts. Instead S&P, for example, sent out a June 2006 email announcing that no retests would be done:

> Simply put – although the RMBS Group does not 'grandfather' existing deals, there is not an absolute and direct link between changes to our new ratings models and subsequent rating actions taken by the RMBS Surveillance Group. As a result, there will not be wholesale rating actions taken in July or shortly thereafter on outstanding RMBS transactions, absent a deterioration in performance and projected credit support on any individual transaction."

PSI at 297-98.

109. The Permanent Subcommittee Report found an email suggest[ing that] "the reason retesting did not occur was, not because S&P thought actual performance data would produce more accurate ratings for existing pools, but because S&P did not have the resources to retest, and lower ratings on existing deals might have disrupted the marketplace, upsetting investment banks and investors. Several S&P managers and analysts confirmed in Subcommittee

interviews that these were the real reasons for the decision not to retest existing RMBS securities. Moody's documents also suggest that resource constraints may lay behind its decision not to retest." PSI at 300.

### Corrective Downgrades Only Came On The Heels of Enhanced Regulation

110.    In June 2007, the SEC issued rules subjecting credit rating agencies to additional oversight. *See* "Oversight of Credit Rating Agencies Registered as Nationally Recognized Statistical Rating Organizations," Exchange Act Release No. 55857 (June 5, 2007), 72 FR 33564 (June 18, 2007).

111.    Shortly thereafter, massive downgrades by Moody's and S&P began, the first occurring on July 10, 2007.  A total of $5.3 billion in certificates, "which constituted 1.3% of 2006 vintage first lien RMBS," were downgraded, along with some subprime RMBS issued in 2005.  All but one of the tranches downgraded were below investment grade.  Further huge negative ratings actions occurred on July 12.  More followed on October 2007.  FCIC Draft Report on Rating Agencies at 28-32. *See also* PSI at 31-2.

112.    "Downgrades of Aaa tranches of RMBS did not begin in earnest until the middle of 2008 and continued steadily until the middle of 2009, when they leveled off with about 80% of tranches downgraded."  "In total, $2.5 trillion worth of RMBS [. . .] have been downgraded since January 2007."  FCIC Draft Report on Rating Agencies at 31 and 33.  By February 8, 2010, "over 90% of subprime RMBS securities issued in 2006 and 2007 and originally rated AAA had been downgraded to junk status by Moody's and S&P."  PSI at 267.

### Credit Rating Agencies Long Claimed Independence, Objectivity, Accuracy and Rigorous Analysis of All Relevant Data in Ratings Decisions

113.    Both S&P and Moody's applied for and obtained the designation of NRSRO,

which required them to submit information to the SEC supporting their independence, objectivity, capability to thoroughly and competently evaluate an issuer's credit, and the reliability of the ratings and methodology. S&P and Moody's first obtained such designation via no action letters from the SEC, and later applied for such status under regulations promulgated under the Credit Rating Agency Reform Act of 2006. Their NRSRO designations were based upon information they supplied to the SEC.

114. In addition to its representations to the SEC, both S&P and Moody's repeatedly published statements that attested to the reliability and credibility of their ratings.

**<u>S&P</u>**

115. On June 23, 2004, Frank Raiter of S&P testified that S&P is "an independent and objective commentator on credit risks." Raiter Testimony-House Hearing 2004 at 16.

116. On February 8, 2005, the President of Standard & Poor's, Kathleen A. Corbet, testified before the Senate Committee on Banking, Housing and Urban Affairs that S&P had a "rigorous and market-tested ratings process, which is designed to ensure that ratings are objective, independent, transparent and credible" and that it "has established an excellent track record of providing the market with independent, objective and rigorous analytical information in the form of credit rating opinions." Testimony of Kathleen A. Corbet before Senate Committee on Banking, Housing and Urban Affairs ("Corbet 2005 Testimony") at 1- 2, available at http://tinyurl.com/7qn24hv.

117. Ms. Corbet further stated that a rating agency's "commitment to, and achievement of, the highest standards of independence, transparency and quality" was "critical" to its role as in the global debt markets. She proclaimed that "these principles are the cornerstones of our

business and have driven our [S&P's] longstanding track record of analytical excellence." She boasted that "S&P's ratings over the past 15 years, less than one percent (1%) of issuers initially rated in the 'AAA' category have defaulted while approximately sixty percent (60%) of those in the 'CCC' category have failed to meet their obligations." Corbet Testimony at 3.

118.    Ms. Corbet also touted S&P's rating process, which includes gathering "economic, financial and other information directly from the issuer, from public filings and from other sources deemed reliable," asking "comprehensive questions," knowledgeable members of the rating committee, effectively managing conflicts of interest arising from the "issuer pays" business model, forensic accounting expertise, "expanded liquidity analysis and recovery assessment," and "enhanced use of quantitative tools and models." Corbet 2005 Testimony at 3-5, 8.

119.    In its annual reports for 2002-2008 and in its 2005 Code of Professional Conduct for ratings practices, S&P repeatedly touted its preeminence in the ratings industry and its independence, objectivity, analytics and integrity in ratings. *See* Complaint filed in *The People of the State of Illinois v. The McGraw-Hill Companies, Inc. and Standard & Poor's Financial Services LLC,* No. 12CH02535 (Cir. Ct. Cook Cnty. Jan. 25, 2012) ("Illinois AG Complaint") at 12-17.

120.    By February 2007, S&P had substantially implemented, and published such implementation of, the *Code of Conduct Fundamentals for Credit Rating Agencies* ("IOSCO CRA Code") issued in December 2004 by the International Organization of Securities Commissions' ("IOSCO"). *See* http://tinyurl.com/btxfddt at 8; http://tinyurl.com/74pgbvg at 5.

121.    In its Code of Conduct, S&P asserts that it is independent, objective, gathers all

relevant information for ratings, rigorously analyses the data and issues honest, well founded ratings. S&P's Code of Conduct defines its "mission" as providing "high-quality, objective, independent, and rigorous analytical information to the marketplace." Standard & Poor's Ratings Services Code of Conduct, January 3, 2012 (S&P Code of Conduct") at 3. "Standard & Poor's Criteria is rigorous, systematic, continuous and based upon historical experience (including back-testing) and objective validation." "Each Credit Rating is based on a thorough analysis of all information known to, and believed relevant by, Standard & Poor's in accordance with its Criteria." S&P Code of Conduct at 3. "Standard & Poor's will not issue a Credit Rating unless it concludes that it has (a) information of satisfactory quality to determine the Credit Rating, (b) sufficient Analysts with appropriate knowledge and experience to determine the Credit Rating, and (c) sufficient historical experience or information to appropriately rate a new type of structure or a new entity, when applicable. Standard & Poor's will withdraw an existing Credit Rating when necessary and appropriate or where the withdrawal is required by law or regulation." S&P Code of Conduct at 4. "Standard & Poor's and its Employees strive to issue Credit Ratings that are independent, unbiased, based upon objective criteria, and well-substantiated." S&P Code of Conduct at 5. "Standard & Poor's will take a Credit Rating Action regardless of the potential effect (economic, political, or otherwise) of that action on Standard & Poor's, an affiliate, an Issuer, an investor, or any other market participant." S&P Code of Conduct at 6.

**Moody's**

122. In 2002, Raymond McDaniel, the then President of Moody's told the SEC:

Moody's internal policies and procedures have mitigated the latent conflict of interest that is inherent in the rating agency business

model. As such, ***our rating opinions are the product of analysis that is unbiased and trustworthy.*** ...

The predictive content of our ratings has been consistently mapped and measured. Moody's and unrelated academics have published studies on the relationship between our ratings and credit defaults. ***Research has shown a strong relationship between Moody's ratings and actual default experience.*** Put simply, corporate bonds that have received higher ratings from Moody's default less frequently on average than lower rated bonds. . .

Our ratings are arrived at through ***a rigorous and judicious process that tends not to react to transitory conditions in favor of longer-term considerations and ratings stability.*** . . .

The level of ratings is not affected by a commercial relationship with an issuer; Moody's will not forebear or refrain from taking a rating action based on the potential effect of the action on Moody's or an issuer;

***Rating actions will reflect judicious consideration of all circumstances influencing an issuer's creditworthiness***;

Moody's long history as a leader in the credit ratings business demonstrates the success of the methodology employed by our analysts. ***In making our rating decisions, we apply accounting, economic, financial, and industry-specific knowledge in evaluating publicly available information, including SEC filings and audited financial statements, and financial and other information voluntarily disclosed by issuers***.

Written Statement of Raymond W. McDaniel, President, Moody's Investors Service, before the

SEC, November 21, 2002, available at http://www.sec.gov/news/extra/credrate/moodys.htm

(emphasis added).

123.    In 2005, Mr. McDaniel reiterated Moody's independence, objectivity and

analytical excellence in issuing ratings.

Moody's ratings have three intrinsic qualities that have made them useful for a variety of purposes. First, as I have mentioned, our ratings are publicly and simultaneously available to all market participants; second, our rating opinions are independently formed;

- 51 -

and third, and possibly most important, Moody's rating performance:

> -can be tested,
>
> -is regularly tested, and
>
> -has been consistently shown to have predictive content.

As a result, ratings have been employed by a diverse collection of investors, issuers, financial institutions, and regulatory bodies, which have a variety of objectives in their use of ratings. For example:

> -Investors use ratings when making investment decisions to help assess a bond's relative creditworthiness;
>
> -Debt issuers use ratings to broaden the marketability of their securities and thereby to improve their access to the capital markets;
>
> -Portfolio managers employ ratings for performance benchmarking and portfolio composition rules (commitments to specific portfolio investment strategies); and
>
> -Regulators of banks, securities firms, and insurers use ratings to determine investment suitability, measure capital adequacy, and promote market stability.

McDaniel 2005 Testimony at 3, available at http://tinyurl.com/czwa9l8.

124. Moody's supposedly assesses the quality of its ratings based upon longitudinal studies of performance of rated bonds. *See* McDaniel 2005 Testimony at 8-9. Given its track record with subprime RMBS, Moody's ratings proved highly inaccurate, and so by its own standards, its ratings lacked the quality it claimed.

125. Moody's claims significant due diligence in gathering all "relevant information"

in a "thorough and comprehensive way" for an initial rating.[8]  *See also* McDaniel Testimony at

5-6.

126.     Moody's also claims that it is rigorous in surveillance of already rated securities:

> With the exception of those ratings which are clearly identified as
> point-in-time ratings, once a credit rating has been published, MIS
> will monitor that rating, as deemed appropriate, on an ongoing
> basis and will modify the credit rating as necessary in response to
> changes in our opinion of the creditworthiness of the Issuer or
> issue. All monitored ratings are reviewed at least once every
> twelve months. MIS generally utilizes the same methodologies to
> monitor ratings as it uses to assign initial ratings. In monitoring
> credit ratings, analysts may review public information as well as
> non-public information provided by the Issuer or its agent through
> periodic meetings or other means. . . . When methodologies
> (including models) are revised, the updated methodology is applied
> to existing transactions within six months, as well as to all new
> ratings.

Moody's Investors Service, Inc. Annual Certification of Form NRSRO 2011, at 91, available at

http://www.moodys.com/PublishingImages/MCO/NRSRO%202011.pdf.  *See also* Moody's

Investor Service, "Report on the Code of Professional Conduct, April 2006, at 11, available at

http://www.moodys.com/uploadpage/Mco%20Documents/Report%20on%20the%20Code%20of

%20Professional%20Conduct%202006.pdf.

---

[8] "The analyst or analysts assigned to a particular Issuer or obligation ("Assigned Analyst") begins the credit analysis by assembling relevant information on the Issuer or obligation. This information may come from public sources or from the Issuer or the Issuer's agent in meetings or other communications with the Assigned Analyst. This information may be supplemented with information generated by MIS or obtained from the market or other third-party sources, including macroeconomic and sector-specific data. . . . Before using data provided by an Issuer or its agent in determining key factual elements of that Issuer's rating, MIS generally will investigate and obtain reasonable verification of such data using an independent source, including by comparison to other information that comes from sources that are independent of the Issuer. MIS adopts all necessary measures so that the information it uses in assigning a credit rating is of sufficient quality and from sources MIS considers to be reliable including, when appropriate, independent third-party sources. . . . [I]t is the [analyst's] responsibility to gather analytical information in a thorough and comprehensive way. . . . Most Issuers operate in good faith and provide reliable information to the securities markets and to MIS, and we rely on Issuers and their agents to do so. Nevertheless, our analysts seek to exercise skepticism with respect to an Issuer's claims and use available sources to investigate and obtain independent verification of such information." Moody's Investors Service, Inc. Annual Certification of Form NRSRO 2011, at 87-88, available at http://www.moodys.com/PublishingImages/MCO/NRSRO%202011.pdf.

127.    Moody's espoused "the quality and integrity of the rating process," independence and avoiding conflicts of interest, and "a responsibility to the investing public." Moody's went so far as to publish, in June 2005, its "Code of Professional Conduct" supposedly embodying and ensuring those characteristics. *See* Moody's 2007 10K at 7.

128.    Of particular importance here, in 2006, in its application for registration with the SEC as a NRSRO, Moody's submitted "Core Principles for the Conduct of Rating Committees." One of those "Core Principals" was that "'Moody's will not forbear or refrain from taking a rating action based on the potential effect (economic, political or otherwise) of the action on Moody's, an issuer, an investor, or any other market participant.' The Core Principles also stated that '[i]n arriving at a Credit Rating, the [rating committee] will only consider analytical factors relevant to the rating opinion.'" SEC Release No. 62802, August 31, 2010, "Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: Moody's Investors Services, Inc." ("SEC Release 62802"), available at http://tinyurl.com/2ftvue8.

129.    By February 2007, Moody's had substantially implemented, and published its implementation of, the *Code of Conduct Fundamentals For Credit Rating Agencies* ("IOSCO CRA Code") issued in December 2004 by the International Organization of Securities Commissions' ("IOSCO"). *See* http://tinyurl.com/btxfddt at 8; http://tinyurl.com/https-www-iosco-org-library at 5. The IOSCO CRA Code provides, in part, the following:

> 1.1    The CRA should adopt, implement and enforce written procedures to ensure that the opinions it disseminates are based on a thorough analysis of all information known to the CRA that is relevant to its analysis according to the CRA's published rating methodology.

> 1.2    The CRA should use rating methodologies that are rigorous, systematic, and, where possible, result in ratings

- 54 -

that can be subjected to some form of objective validation based on historical experience.

1.3    In assessing an issuer's creditworthiness, analysts involved in the preparation or review of any rating action should use methodologies established by the CRA. Analysts should apply a given methodology in a consistent manner, as determined by the CRA.

1.4    Credit ratings should be assigned by the CRA and not by any individual analyst employed by the CRA; ratings should reflect all information known, and believed to be relevant, to the CRA, consistent with its published methodology; and the CRA should use people who, individually or collectively have appropriate knowledge and experience in developing a rating opinion for the type of credit being applied.

1.5    The CRA should maintain internal records to support its credit opinions for a reasonable period of time or in accordance with applicable law.

1.6    The CRA and its analysts should take steps to avoid issuing any credit analyses or reports that contain misrepresentations or are otherwise misleading as to the general creditworthiness of an issuer or obligation.

1.7    The CRA should ensure that it has and devotes sufficient resources to carry out high-quality credit assessments of all obligations and issuers it rates. When deciding whether to rate or continue rating an obligation or issuer, it should assess whether it is able to devote sufficient personnel with sufficient skill sets to make a proper rating assessment, and whether its personnel likely will have access to sufficient information needed in order make such an assessment.

1.8    The CRA should structure its rating teams to promote continuity and avoid bias in the rating process.

1.9    Except for ratings that clearly indicate they do not entail ongoing surveillance, once a rating is published the CRA should monitor on an ongoing basis and update the rating by:

    a.    regularly reviewing the issuer's creditworthiness;

b.　　initiating a review of the status of the rating upon becoming aware of any information that might reasonably be expected to result in a rating action (including termination of a rating), consistent with the applicable rating methodology; and,

c.　　updating on a timely basis the rating, as appropriate, based on the results of such review.

1.10　　Where a CRA makes its ratings available to the public, the CRA should publicly announce if it discontinues rating an issuer or obligation. Where a CRA's ratings are provided only to its subscribers, the CRA should announce to its subscribers if it discontinues rating an issuer or obligation. In both cases, continuing publications by the CRA of the discontinued rating should indicate the date the rating was last updated and the fact that the rating is no longer being updated.

…

1.12　　The CRA and its employees should deal fairly and honestly with issuers, investors, other market participants, and the public.

1.13　　The CRA's analysts should be held to high standards of integrity, and the CRA should not employ individuals with demonstrably compromised integrity

. . .

2.1　　The CRA should not forbear or refrain from taking a rating action based on the potential effect (economic, political, or otherwise) of the action on the CRA, an issuer, an investor, or other market participant.

2.2　　The CRA and its analysts should use care and professional judgment to maintain both the substance and appearance of independence and objectivity.

2.3　　The determination of a credit rating should be influenced only by factors relevant to the credit assessment.

2.4　　The credit rating a CRA assigns to an issuer or security should not be affected by the existence of or potential for a

business relationship between the CRA (or its affiliates) and the issuer (or its affiliates) or any other party, or the non-existence of such a relationship.

. . .

3.3     The CRA should indicate with each of its ratings when the rating was last updated.

. . .

3.8     In order to promote transparency and to enable the market to best judge the performance of the ratings, the CRA, where possible, should publish sufficient information about the historical default rates of CRA rating categories and whether the default rates of these categories have changed over time, so that interested parties can understand the historical performance of each category and if and how rating categories have changed, and be able to draw quality comparisons among ratings given by different CRAs. If the nature of the rating or other circumstances make a historical default rate inappropriate, statistically invalid, or otherwise likely to mislead the users of the rating, the CRA should explain this.

IOSCO CRA Code at 4-9, available at http://tinyurl.com/ygm28af. *See also* http://bit.ly/NKAaZC at 3 ("MIS [Moody's] has publicly endorsed the IOSCO Principles").

125.    Moody's stills claims that it ratings are:

(i)     Arrived at independently ("In the rating process, MIS [Moody's] maintains independence in its relationships with Issuers, investors, and other interested entities." "MIS will not forbear or refrain from taking a Credit Rating Action, or from initiating or concluding a review of a Credit Rating, based on the potential effect (economic, political, or otherwise) of the action on MIS, an Issuer, an investor or other market participant.");

(ii)    Objectively ("As a matter of policy, and in keeping with its role as an independent and objective publisher of opinions, MIS [Moody's] retains complete editorial control over the content of its Credit Ratings, credit opinions, commentary, and all related publications.");

(iii) Transparently ("MIS [Moody's] will make Credit Rating Actions on public debt securities or public debt Issuers available to the public without cost." "MIS will publicly disclose its policies, or summaries of policies, for distributing Credit Ratings, Credit Rating Actions, reports, and updates and will keep current such policies and summaries.");

(iv) Honestly ("MIS [Moody's] and its Employees will deal fairly and honestly with Issuers, investors, other market participants, and the public. MIS will hold its Employees to high standards of integrity.");

(v) With competent personnel ("MIS will assess whether it is able to devote sufficient personnel with appropriate skills to make a proper rating assessment");

(vi) With sufficient information ("MIS [Moody's] will consider all information known and believed to be relevant by the applicable Analyst and rating committee about an Issuer, including information received from a source other than the Issuer or underwriter that the applicable Analyst and rating committee find credible and potentially significant to a rating decision in a manner generally consistent with MIS's published methodologies.");

(vii) In good faith ("MIS [Moody's] adopts all necessary measures so that the information it uses in assigning a Credit Rating is of sufficient quality and from sources MIS considers to be reliable including, when appropriate, independent third-party sources.");

(viii) With rigorous analysis ("MIS will develop and maintain rigorous and systematic rating methodologies. Where possible, resulting Credit Ratings will be periodically subjected to objective validation based on historical experience."); and

(ix) Vigilant surveillance (Moody's "will allocate adequate personnel and financial resources to monitoring and updating its Credit Ratings. Once a Credit Rating is published, and unless it is withdrawn, MIS will monitor the Credit Rating and update it by:

(a) At least once in any twelve-month period, reviewing the

- 58 -

creditworthiness of the Issuer or other relevant entity or debt or debt-like securities;

(b)     Initiating a review of the status of the Credit Rating upon becoming aware of any information that might reasonably be expected to result in a Credit Rating Action (including withdrawing a Credit Rating) consistent with the applicable rating methodology; and

(c)     Updating on a timely basis the Credit Rating, as appropriate, based on the results of any such review referred to in (a) or (b) above. Where practicable, subsequent monitoring will incorporate all cumulative experience obtained. MIS will apply changes in relevant key rating assumptions both to current and subsequent Credit Ratings.").

*See* Moody's Code of Professional Conduct dated June 2011 at 2, 6, 7, 8, 9, 10, 11, available at http://bit.ly/NKAaZC.

### Ratings Were Inflated

130.     In July 2008, "the SEC released findings from staff examinations of three major credit rating agencies that found significant weaknesses in ratings practices and the need for remedial action by the firms to provide meaningful ratings and the necessary levels of disclosure to investors. The examinations found that rating agencies struggled significantly with the increase in the number and complexity of subprime RMBS and CDO deals since 2002. The examinations uncovered that none of the rating agencies examined had specific written comprehensive procedures for rating RMBS and CDOs. Significant aspects of the rating process were not always disclosed or even documented by the firms, and conflicts of interest were not always managed appropriately." PWG 10/2008 Update at 15.

131.     On June 2, 2010, the FCIC issued a preliminary report noting inflated ratings. [Preliminary Report at 2].

132.     On April 23, 2010, the FCIC had hearings on the role of credit rating agencies in the financial meltdown.   Exhibit #1a, a Memorandum from   Senators Carl Levin and Tom Coburn, noted that both S&P and Moody's changed their rating models in 2006 and 2007, but did not re-rate already issued subprime RMBS.  PSI 4/23/2010 Hearing Ex. #1a at 8-9.

133.     The January 2011 FCIC report found inflated ratings. FCIC Report at *xxv*, 210-121.

134.     On April 13, 2011, the PSI report was released, which found specifically that Moody's and S&P issued inflated ratings.  PSI at 243, 245-246.  More specifically, "[i]naccurate AAA credit ratings introduced systemic risk into the U.S. financial system and constituted a key cause of the financial crisis."  PSI at 243-244.

### Conflicts and a Race to the Bottom Contributed to Ratings Inflation

135.     One cause of rampant ratings inflation was the conflicts of interest created by who paid for ratings.  Moody's and S&P "were paid by the Wall Street firms that sought their ratings and profited from the financial products being rated. Under this 'issuer pays' model, the rating agencies were dependent upon those Wall Street firms to bring them business, and were vulnerable to threats that the firms would take their business elsewhere if they did not get the ratings they wanted. The ratings agencies weakened their standards as each competed to provide the most favorable rating to win business and greater market share. The result was a race to the bottom."  PSI at 7.

### Moody's Corporate Culture Preordained Inflated and Unsupported Ratings

136.     Another recent, and perhaps the most dramatic, evidence of Moody's Faustian bargain is the seventy-eight page letter, dated August 8, 2011, from William J. Harrington, who

worked for Moody's from 1999 until July 2010 in the unit that produced many of the failed ratings on RMBS during the housing bubble. *See* Harrington, William J., "Comment on SEC Proposed Rules for Nationally Recognized Statistical Rating Organizations," File Number S7-18-11, 8/8/2011 ("Harrington Letter"), available at http://www.sec.gov/comments/s7-18-11/s71811-33.pdf.

137. Excerpts from the letter paint Moody's as lacking integrity in making ratings. *See, e.g.*, "Moody's argues that RMBS committees could not have factored the collapse of real estate prices into their opinions, given that the scale of the collapse was both unprecedented and unforeseeable. This rationale is as unconvincing as it is disingenuous, for it pretends that Moody's and other financial players were not designing and operating the conveyances that carried real estate prices to unsustainable levels in the first place. A roller coaster inexorably chugs up to stomach-turning heights before it hurtles downward, and both a carnival operator and a thrill seeker understand the nature of the ride's operations." Harrington Letter at 5.

138. "The rationale of 'who could know?' is wholly undone through even a cursory examination of the actions of Moody's and other financial players in the structured finance sector. Moody's and other financial players took care to protect their earning should the real estate bubble that they were ushering into the world subsequently collapse." Harrington Letter at 5.

139. "Moody's management is also on record as having known what it was embarking on when it decided to race S&P and Fitch to the bottom of the ratings heap. In a 2009 group meeting, Doug Lucas and Andy Kimball presented data that showed that external constituents had regarded analysts at Moody's, S&P and Fitch in declining respect from 2004 onward.

Management had tracked this ongoing erosion since 2004 without taking remedial action and without reflecting this view in annual evaluations." Harrington Letter at 5-6.

140. "Two internal control functions of Credit Policy and Compliance develop and enforce the marching orders du jour. Credit Policy has the last word on changes to methodology as well as freedom to contest the outcome of any committee simply because one of its staff believes the opinion to be "wrong". The Compliance Department has implemented several complicated policies that impact each Moody's analyst and special additional ones that impact only analysts in the Derivatives Group. Collectively, the Compliance policies serve the sole purpose of constructing a virtual Potemkin village for regulators to admire." Harrington Letter at 9.

141. "The Compliance Department is also an enforcer that actively harasses analysts viewed as 'troublesome,' i.e., independent, and is well-experienced in doing so. Several of its prominent officers trained for the Compliance Department (and Credit Policy) by managing the issuing and monitoring of RMBS opinions. The contributor can attest to harassment meted out by the Compliance Department while employed at Moody's as well as ongoing harassment that has stopped only recently." Harrington Letter at 9.

142. "The ongoing, unresolved conflict of interest plays out in the formation of Moody's opinions. These public opinions of Moody's are often at odds with its private opinions. In some cases, the distinction between public and private opinion is an explicit one. Much more often, the distinction between the two is unknown even to Moody's. Members of committees vote one opinion for publication and keep their private opinions to themselves. A committee member who votes differently, i.e. one who votes the same opinion for publication as she holds

privately, earns her own self-respect. She also courts retaliation from management." Harrington Letter at 10.

143. "Unfortunately, the contributor participated in numerous committees where management maneuvered for a prescribed result through intimidation of other voting members. Intimidation could be blatant, with managers belittling opposing views, interrupting while others speak, making evident that they didn't consider the committee memo to be relevant or engaging in non-committee activities such as communicating on an electronic device until ready to speak themselves. Managers might also adopt a strictly formulaic approach and seek to have aspects of others' opinions deemed 'irrelevant' to the opinion at hand or challenge a member with a possible ramification of her opinion along the lines of 'with your view, you should be suggesting that the entire methodology be up for grabs and we're not here to do that.'" Harrington Letter at 14-15.

144. "In short, Moody's management can be trusted only to continue its practice of running roughshod over committee proceedings and continually subjecting analysts to the conflict of interest of preserving their job security." Harrington Letter at 15.

145. In an email from Moody's Chief Risk Officer to CEO Raymond McDaniel, dated October 21, 2007, the Chief Risk Officer stated that "'Analysts and [Managing Directors] are continually "pitched" by bankers, issuers, investors—all with reasonable arguments—whose views can color credit judgment, sometimes improving it, other times degrading it (we "drink the kool-aid"). Coupled with strong internal emphasis on market share & margin focus, this does constitute a "risk" to ratings quality.'" Senate Permanent Subcommittee on Investigations, Ex. 24b, MOODY'S-COGR-0038026, noted on Exhibit List for the Hearing On Wall Street and The

Financial Crisis: The Role of Credit Rating Agencies," April 23, 2010, "Excerpts from Documents Related to Credit Rating Agencies Competitive Pressures Affecting Ratings," available at http://media.ft.com/cms/80662db0-4e75-11df-b48d-00144feab49a.pdf.

146. Moody's culture also chose "to hide its head in the sand" by not questioning the data it received from issuers about individual loans despite knowledge of fraud and deterioration in the RMBS performance. Instead, Moody's continued its policy of relying on whatever information the securitization sponsor provided and laying off the responsibility for critical examination on others.

147. Compounding the deficiencies with Moody's rating methods was its chronic understaffing; there were simply too few analysts for the volume of work in the time that was required. Moody's CEO, Ray McDaniel, readily acknowledged during the Subcommittee's April 23 hearing that resources were stressed and that Moody's was short staffed. He testified: "People were working longer hours than we wanted them to, working more days of the week than we wanted them to." He continued: "It was not for lack of having open positions, but with the pace at which the market was growing, it was difficult to fill positions as quickly as we would have liked." PSI at 304-305.

148. "Moody's staff, however, had raised concerns about personnel shortages impacting their work quality as early as 2002. A 2002 survey of the Structured Finance Group staff reported, for example: 'There is some concern about workload and its impact on operating effectiveness. … Most acknowledge that Moody's intends to run lean, but there is some question of whether effectiveness is compromised by the current deployment of staff.'" PSI at 304-305.

149. "Similar concerns were expressed three years later in a 2005 employee survey:

'We are over worked. Too many demands are placed on us for admin[istrative] tasks ... and are detracting from primary workflow .... We need better technology to meet the demand of running increasingly sophisticated models.'" PSI at 304-305.

150.  "In 2006, Moody's analyst Richard Michalek worried that investment bankers were taking advantage of the fact that analysts did not have the time to understand complex deals. He wrote: 'I am worried that we are not able to give these complicated deals the attention they really deserve, and that they (CS) [Credit Suisse] are taking advantage of the "light" review and the growing sense of "precedent."' PSI at 304-305.

151.  "Moody's managers and analysts interviewed by the Subcommittee stated that staff shortages impacted how much time could be spent analyzing a transaction. One analyst responsible for rating CDOs told the Subcommittee that, during the height of the boom, Moody's analysts didn't have time to understand the complex deals being rated and had to set priorities on what issues would be examined." PSI at 304-305.

147.  And, as Harrington noted, "[t]he lesson learned to-date by the management of Moody's and that of Moody's Corporation with respect to their roles in the financial crisis and its aftermath is that they can brazen out anything and are untouchable." Harrington Letter at 9.  The SEC confirmed that Moody's thought it was invulnerable on at least one occasion--Moody's believed it "could violate [Moody's ratings] procedures without detection." SEC Release No. 62802.  The incident involved a newly constructed rating model that yielded inflated ratings. Moody's refused to correct such ratings for fear of negatively impacting its business

reputation,[9] which action clearly violated its Core Principal that Moody's would not refrain from downgrading ratings because of any negative impact on Moody's, "an issuer, an investor, or any other market participant." SEC Release No. 62802.

### S&P's Corporate Culture Similarly Produced Inflated and Unsupported Ratings

148.    S&P's culture of objectivity for sale emerges as early as 2001. S&P strongly admonished an analyst who balked at providing a rating without sufficient information: "[a]ny request for loan level tapes is TOTALLY UNREASONABLE!!! Most investors don't have it and can't provide it. Nevertheless we MUST produce a credit estimate. . . . It is your responsibility to provide those credit estimates and your responsibility to devise some method for doing so. Please provide the credit estimates requested." Emails between Frank Raiter of S&P and Richard Gugliada, a Managing Director of S&P in March 2001, available at http://tinyurl.com/cunpnja.

149.    When interviewed by Bloomberg in 2008, Gugliada acknowledges that Moody's and S&P repeatedly lowered their standards for rating structured investment pools to gain market share. He admitted that "'I knew it was wrong at the time. . . . It was either that or skip the business. That wasn't my mandate. My mandate was to find a way. Find the way.'" Smith, Elliot Blair, Bloomberg, "'Race to Bottom' at Moody's, S&P Secured Subprime's Boom, Bust," September 25, 2008, available at http://www.bloomberg.com/apps/news?pid=21070001&sid= ax3vfya_Vtdo.

---

[9] "'In this particular case we [Moody's] seem to face an important reputation risk issue. To be fully honest this latter issue is so important that I would feel inclined at this stage to minimize ratings impact and accept unstressed parameters that are within possible ranges rather than even allow for the possibility of a hint that the model has a bug.' On April 27, 2007, After additional analysis, the rating committee voted not to downgrade." **SEC Release No. 62802.**

150.    More evidence of S&P's culture of rating for profit emerged in hearings before

the House oversight committee on October 22, 2008, when an Instant Message between two S&P

employees was revealed:

> S&P Employee #1, Rahul Dilip Shah:  btw-that deal is ridiculous
>
> S&P Employee #2, Shannon Mooney:  i know right…model def does not capture half of the risk
>
> S&P Employee #1:  we should not be rating it
>
> S&P Employee #2:  we rate every deal
>
> S&P Employee #2:  it could be structured by cows and we would rate it
>
> S&P Employee #1:  but there's a lot of risk associated with it-I personally don't      feel comfy signing off as a committee member.

S&P rated the deal anyway.  Message available at http://oversight-archive.waxman.house.gov/

documents/20081022112325.pdf.   *See also* http://tinyurl.com/5sp8xb; PSI at 297, n. 1155,

4/5/2007 instant message exchange between Shannon Mooney and Rahul Dilip Shah, Hearing

Exhibit 4/23-30, http://ftalphaville.ft.com/blog/2008/10/23/17359/rating-cows/.

151.    Excerpts from documents obtained by the PSI reveal a culture at S&P to subvert

ratings to get market share and knowledge that ratings were not accurate.  *See, e.g.*, excerpts of

an internal S&P email dated March 23, 2005 with the subject "'Levels 5.6(c),' S&P-SEC-E

677671, Ex. 5" ("'Version 6.0 [a new version of the S&P ratings model] could've been released

months ago and resources assigned elsewhere if we didn't have to massage the sub-prime and

Alt-A numbers to preserve market share. … We have known for some time (based upon pool

level data and LEVELS 6.0 testing that – Subprime: B and BB levels need to be raised; ALT A:

B, BB and BBB levels need to be raised (we have had a disproportionate number of

downgrades.)'"); *see also* the excerpt from an email dated June 14, 2005 from an S&P employee, S&P-SEC-E 1291974m Ex. 6 ("*Screwing with criteria to 'get the deal' is putting the entire S&P franchise at risk – it's a bad idea."*). PSI Exhibit #1b, available at http://media.ft.com/cms/80662db0-4e75-11df-b48d-00144feab49a.pdf and at http://www.scribd. com/doc/30512605/Fraud-Credit-Rating-Agencies-Competitive-Pressures-Affecting-Ratings.

152. S&P also suffered from chronic understaffing, which compromised the quality of its ratings. In 2004, for example, a managing director in the RMBS Group wrote a lengthy email about the resource problems impacting credit analysis:

> I am trying to put my hat on not only for ABS/RMBS but for the department and be helpful but feel that it is necessary to re-iterate that there is a shortage in resources in RMBS. If I did not convey this to each of you I would be doing a disservice to each of you and the department. As an update, December is going to be our busiest month ever in RMBS. I am also concerned that there is a perception that we have been getting all the work done up until now and therefore can continue to do so. We ran our Staffing model assuming the analysts are working 60 hours a week and we are short resources. We could talk about the assumptions and make modifications but the results would be similar. The analysts on average are working longer than this and we are burning them out. We have had a couple of resignations and expect more. It has come to my attention in the last couple of days that we have a number of staff members that are experiencing health issues.

PSI at 306 and n. 1189 citing to a December 3, 2004 email from Gain McDermott to Abe Losice and Pat Jordan, document No. PSI-S&P-RFN-000034.

153. "A May 2006 internal email from an S&P senior manager in the Structured Finance Real Estate Ratings Group expressed similar concerns:

> We spend most of our time keeping each other and our staff calm. Tensions are high. Just too much work, not enough people, pressure from company, quite a bit of turnover and no coordination of the non-deal 'stuff' they want us and our staff to do . ... The

> head of the S&P CDO Ratings Group sent a 2006 email to the head of the Structured Finance Department to make a similar point. She wrote: 'While I realize that our revenues and client service numbers don't indicate any ill [e]ffects from our severe understaffing situation, I am more concerned than ever that we are on a downward spiral of morale, analytical leadership/quality and client service.'

PSI at 306 and n. 1191, citing an October 31, 2006 S&P internal email, document No. PSI-S&P-RFN-000001.

154.     S&P also short-staffed its surveillance.  In the spring of 2006, [the head of S&P's RMBS Surveillance Group] emailed her colleague about her growing anxiety:

> RMBS has an all time high of 5900 transactions. Each time I consider what my group is faced with, I become more and more anxious. The situation with Lal [a surveillance analyst], being off line or out of the group, is having a huge impact."  In June 2006, she wrote that the problems were not getting better: "It really feels like I am repeating myself when it comes to completing a very simple project and addressing some of the other surveillance needs. … The inability to make a decision about how the project is going to be resourced is causing undue stress. I have talked to you and Peter [D'Erchia, head of global structured finance surveillance,] about each of the issues below and at this point I am not sure what else you need from me. …  To rehash the points below:  In addition to the project above that involves some 863 deals, I have a back log of deals that are out of date with regard to ratings. … We recognize that I am still understaffed with these two additional bodies. … [W]e may be falling further behind at the rate the deals are closing. If we do not agree on the actual number, certainly we can agree that I need more recourse if I am ever going to be near compliance."  In December 2006, she wrote:  "In light of the current state of residential mortgage performance, especially sub-prime, I think it would be very beneficial for the RMBS surveillance team to have the work being done by the temps to continue. It is still very important that performance data is loaded on a timely basis as this has an impact on our exception reports. Currently, there are nearly 1,000 deals with data loads aged beyond one month."  In February 2007, she expressed concerns about having adequate resources to address potential downgrades in RMBS:  "I talked to Tommy yesterday and he thinks that the

> [RMBS] ratings are not going to hold through 2007. He asked me to begin discussing taking rating actions earlier on the poor performing deals. I have been thinking about this for much of the night. We do not have the resources to support what we are doing now. A new process, without the right support, would be overwhelming. ... My group is under serious pressure to respond to the burgeoning poor performance of sub-prime deals. … we are really falling behind.… I am seeing evidence that I really need to add staff to keep up with what is going on with subprime and mortgage performance in general, NOW."

PSI at 307-8.

## Huge Profits Impelled The Rating Agencies to Inflate Ratings

155.    The PSI report found that:

> It was not in the short term economic interest of either Moody's or S&P, however, to provide accurate credit ratings for high risk RMBS and CDO securities, because doing so would have hurt their own revenues. Instead, the credit rating agencies' profits became increasingly reliant on the fees generated by issuing a large volume of structured finance ratings.  In the end, Moody's and S&P provided AAA ratings to tens of thousands of high risk RMBS and CDO securities and then, when those products began to incur losses, issued mass downgrades that shocked the financial markets, hammered the value of the mortgage related securities, and helped trigger the financial crisis.

PSI at 7.  *See also* the interview, cited above, of Richard Gugliada, formerly of S&P, in which he said that "'the revenue potential was too large'" to refuse any rating, even one without essential information to make a proper rating.  *See Abu Dhabi Commercial Bank v. Morgan Stanley* at 50, n. 179.The earnings from RMBS and related CDOs were unprecedented.  From 2004 through 2007, Moody's and S&P issued more ratings and earned more revenues than it had ever earned before.

156.    S&P charged substantial fees to rate RMBS.  "S&P charged issuers generally from $40,000 to $135,000 to rate tranches of an RMBS."  "Surveillance fees, which may be

imposed at the initial rating or annually, ranged generally from $5,000 to $50,000 for the mortgage backed securities." Revenues increased dramatically, as well. S&P revenue from RMBS and mortgage related CDO ratings went from $64 million in 2002 to over $265 million in 2006. Structured finance revenues increased from $184 million in 2002 to $561 million in 2007. In 2007, structured finance was 49% of all S&P revenues from ratings. PSI at 256-7.

157.    Similarly, from 2004 to 2007, Moody's issued over 4,000 RMBS ratings. "Moody's gross revenues from RMBS and CDO ratings more than tripled, going from over $61 million in 2002 to over $260 million in 2006." PSI at 30-31, 256.

## CLASS ALLEGATIONS

158.    Plaintiffs bring this action on their own behalf and as a class action pursuant to 735 ILCS 5/2-801, *et. seq.,* on behalf of all community banks other individuals, entities or institutional investors residing in Illinois that purchased or otherwise acquired subprime RMBS rated investment grade (AAA to BBB by S&P) or (Aaa to Baa3 by Moody's) (collectively "the Certificates"), from January 1, 2007 – the date by which the United States Senate Permanent Subcommittee on Investigations found that S&P was knowingly providing unsupported investment grade ratings to RMBS – through February 2008 ("the Class Period"), and were damaged thereby (the "Class").

159.    Excluded from the Class are the defendants, their officers and directors at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which any defendant has or had a controlling interest.

160.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiffs at this time

and can only be ascertained through appropriate discovery, plaintiffs believe that there are hundreds of members in the proposed Class.

161. Plaintiffs will fairly and adequately protect the interests of the Class members and have retained competent and experienced counsel. Plaintiffs have no interests that are contrary or in conflict with those of the Class members that plaintiffs seek to represent.

162. Plaintiffs' claims are typical of the claims of the Class members. Plaintiffs and all members of the Class purchased investment grade subprime RMBS Certificates during the Class Period and have sustained damages as a result of the wrongful conduct complained of herein.

163. A class action is an appropriate and superior method for the fair and efficient adjudication of the controversy. The expense and burden of individual litigation by Class members make it impossible or impractical for Class members individually to seek redress for the wrongful conduct alleged herein.

164. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the Illinois Consumer Fraud and Deceptive Trade Practices Act and Uniform Deceptive Trade Practices Act were violated by the RAs and/or their acts and/or omissions as alleged herein;

(b) Whether the acts and omissions of the RAs alleged herein constitute fraud under Illinois common law;

(c) Whether the RAs intentionally and/or recklessly issued and maintained inflated ratings on the Certificates;

(d)     Whether the RAs misrepresented or omitted material information regarding their independence, objectivity, rating models, the rigor of their analyses, whether they considered all material information needed for accurate ratings and re-ratings of the Certificates during the Class Period; and

(e)     Whether the Class members have sustained damages and, if so, the appropriate measure.

166.    Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

167.    The names and addresses of the record owners of the Certificates purchased are available from the trustees of the various securitizations and from their transfer agent(s). Notice can be provided to persons who purchased or otherwise acquired the Certificates by a combination of published notice and first class mail, using techniques and forms of notice similar to those customarily used in other state and federal securities class actions.

## CAUSES OF ACTION

### Count I

### Consumer Fraud and Deceptive Business Practices Act Against Moody's and S&P

172.    FNBR realleges and incorporates the paragraphs above.

173.    While engaged in trade or commerce, the RAs committed unfair and/or deceptive trade practices, and engaged in unfair methods of competition declared unlawful under Section 2 of the Consumer Fraud Act, 815 ILCS 505/2, by making the misrepresentations and omissions set forth above directly and indirectly to FNBR and all members of the putative class.

174.    The RAs knowingly or recklessly issued false initial AAA ratings on the RMBS

at issue and then failed to re-rate those RMBS despite acquiring additional information further demonstrating that such RMBS were not AAA and justifying downgrades.

175. Ratings affect pricing. Therefore, the ratings of the Certificates were not only an assessment of the likelihood of repayment and default, but also representations of the present value of the RMBS at all times that the ratings were outstanding as the ratings directly affected the pricing of the Certificates.

176. FNBR saw Moody's' and S&P's ratings and made investment decisions based on those ratings. But for the AAA and Aaa ratings, FNBR would not have purchased the Certificates, and certainly not at the price it paid, and so would not have suffered the damages alleged in this Complaint.

177. FNBR believed that the ratings were credible and reliable based upon the fact that federal law and regulations permitted Moody's and S&P to rate the Certificates for use in meeting statutory reserve requirements, and the reputation of Moody's and S&P for issuing and maintaining reliable and credible ratings and the inherent characteristics of accurate ratings – accuracy, independence, objectivity, integrity, well researched and supported models, integrity, ongoing surveillance and rigorous analysis of all information relevant to ratings both at issuance and thereafter.

178. The RAs knowingly or recklessly failed to disclose that they had subverted the reliability and credibility of their ratings in return for profits and that they were no longer independent, objective, rigorously analytical, using reliable models, considering all relevant information and doing adequate surveillance. These material omissions harmed FNBR and the putative class.

179. The RAs also committed unfair and/or deceptive trade practices, and engaged in unfair methods of competition by failing to disclose that S&P and Moody's did not believe their ratings to be an accurate assessment of the credit risk of the Certificates at issuance of the ratings and at all times thereafter.

180. S&P failed to disclose that it did not comply with its Code of Conduct, as set forth in the Illinois AG Complaint at 41-42, which are incorporated by reference.

181. Moody's also failed to disclose it had not complied with its Code of Conduct, as set forth above.

182. Moody's also committed unfair and/or deceptive trade practices, and engaged in unfair methods of competition by failing to disclose that: (i) its rating model assumed a 4% increase in home prices each year despite knowing that housing values were stagnant or declining as early as 2006 and certainly by early 2007; (ii) it did not use a rating model for subprime RMBS until December 2006 or after and instead "benchmarked" new RMBS against RMBS that it had already rated; (iii) it did not apply its updated rating model for subprime loans to existing ratings on subprime RMBS; (iv) for purposes of rating the Certificates, Moody's did not consider the quality of a loan originator and the pool servicer until December 2006 or after; (v) it did not have sufficient staff to adequately rate subprime RMBS; (vi) it did not act independently in issuing and revising ratings of the Certificates; (vii) it did not consider all relevant data in issuing and surveilling ratings; and (viii) the data used in its model was based on the historical performance of prime loans and/or other debt unlike subprime loans and other "affordability" loan products, and therefore, there was no basis for their subprime ratings.

183. S&P committed unfair and/or deceptive trade practices, and engaged in unfair

methods of competition by failing to disclose that: (i) it did not apply its updated rating model for subprime loans to existing ratings of the Certificates; (ii) in rating the Certificates, S&P did not consider the quality of a loan originator and the pool servicer; (iii) it did not have sufficient staff to adequately rate the Certificates; (iv) it did not act independently in issuing and revising ratings for the Certificates; (v) it did not consider all relevant data in issuing and surveilling ratings of the Certificates; and (vi) the data used in its model was based on the historical performance of prime loans and/or other debt unlike the subprime loans and other "affordability" loan products underlying the Certificates, and therefore, there was no basis for their ratings.

184. FNBR was actually deceived by the AAA ratings on the Certificates into believing that the Certificates had a very small chance of default and loss and purchased the Certificates based on such ratings being true. FNBR was also deceived by the omissions listed above and would not have purchased the Certificates had it known of the omissions.

185. Section 10a of the Consumer Fraud and Deceptive Business Practices Act permits a private litigant who suffers actual damage from violations of that act and the Uniform Deceptive Trade Practices Act to recover "actual economic damages or any other relief which the court deems proper," including "injunctive relief where appropriate and "reasonable attorney's fees and costs to the prevailing party." 815 ILCS 505/10a.

186. Plaintiff has suffered actual damages as a result of the RAs unfair and/or deceptive trade practices and unfair methods of competition. To date, FNBR has suffered $1,792,000 in write downs in the market values of the AAA RMBS it purchased during the class period, which are deemed other than temporary impairment ("OTTI"). The $1,792,000 write down is pursuant to "mark-to-market" or "fair value" accounting. The write downs negatively

impact both earnings and capital. FNBR has also suffered higher FDIC fees and OCC fees, increased regulatory supervision, increased capital requirements, the loss of earnings arising from having less money to lend, and a default on its holding company loan.

187. Class members have suffered similar damages.

## Count II

## Uniform Deceptive Trade Practices Act Against Moody's and S&P

188. FNBR realleges and incorporates the paragraphs above.

189. While engaged in trade or commerce, the RAs violated Section 2 of the Uniform Deceptive Trade Practices Act, 815 ILCS 510/2(a)(5), (7) and (12) by falsely representing, directly and indirectly, that the Certificates were in fact AAA quality, at issuance and continued to be such until downgraded after the Class Period, thus causing the value of the Certificates to be inflated until after the Class Period.

202. S&P and Moody's failed to disclose to FNBR and the putative class that both NRSROs had abandoned the requisites for their NRSRO status—that their ratings were no longer independent, objective, a product of rigorous analysis taking into account all relevant information, and were based on models derived from sufficient and appropriate data to form credible and reliable ratings. S&P and Moody's did so knowing that investors such as FNBR and the putative class members were relying on their ratings, the fact that federal law and regulations permitted Moody's and S&P to rate the Certificates for use in meeting statutory reserve requirements, and the reputation of Moody's and S&P for issuing and maintaining reliable and credible ratings and the inherent characteristics of accurate ratings--accuracy, independence, objectivity, integrity, well researched and supported models, integrity, ongoing

surveillance and rigorous analysis of all information relevant to ratings both at issuance and thereafter.

190.     S&P and Moody's also failed to disclose to FNBR and the putative class that their lack of independence derived from competition for market share, profits, ratings shopping, and conflicts of interest, all of which adversely affected their ratings.  Thus, their AAA ratings were rendered deceptive and fraudulent because the RAs knew that investors such as FNBR relied on the independence of their ratings and the RAs themselves in considering the ratings in connection with the purchase and holding of the Certificates.

191.     Of particular importance to FNBR and the putative class, Moody's and S&P failed to disclose the flaws in its surveillance of the Certificates to assess the continued validity of the initial ratings to predict the credit risk of the Certificates.

192.     The RAs committed unfair and/or deceptive trade practices, and engaged in unfair methods of competition by failing to disclose that they: (i) did not believe that their ratings for the Certificates were accurate; (ii) they knew they had no basis for believing that their ratings for the Certificates were accurate; or (iii) they were reckless in issuing ratings when they did not have sufficient data to predict or assess the likely credit risk of the Certificates.

193.     S&P failed to disclose to FNBR and the class members that it did not comply with its Code of Conduct, as set forth in the Illinois AG Complaint at 41-42, which are incorporated by reference, and upon which it knew that FNBR and the class relied upon directly or indirectly in making their decisions to purchase the Certificates.

194.     Moody's also failed to disclose to FNBR and the class that it had not complied with its Code of Conduct, including standards of independence, objectivity, rigorous analysis,

good faith, sufficient information, appropriateness of its models, and surveillance of its ratings.

195.    Moody's also committed unfair and/or deceptive trade practices, and engaged in unfair methods of competition by failing to disclose to FNBR and the putative class members that: (i) its rating model assumed a 4% increase in home prices each year despite knowing that housing values were stagnant or declining as early as 2006 and certainly by early 2007; (ii) it did not use a rating model for subprime RMBS until December 2006 or after and instead "benchmarked" new RMBS against RMBS that it had already rated; (iii) it did not apply its updated rating model for subprime loans to existing ratings on subprime RMBS; (iv) for purposes of rating the Certificates, Moody's did not consider the quality of a loan originator and the pool servicer until December 2006 or after; (v) it did not have sufficient staff to adequately rate subprime RMBS; (vi) it did not act independently in issuing and revising ratings of the Certificates; (vii) it did not consider all relevant data in issuing and surveilling ratings; and (viii) the data used in its model was based on the historical performance of prime loans and/or other debt unlike subprime loans and other "affordability" loan products, and therefore, there was no basis for their subprime  ratings.

196.    S&P committed unfair and/or deceptive trade practices, and engaged in unfair methods of competition by failing to disclose that:   (i) it did not apply its updated rating model for subprime loans to existing ratings of the Certificates; (ii) in rating the Certificates, S&P did not consider the quality of a loan originator and the pool servicer; (iii) it did not have sufficient staff to adequately rate the Certificates; (iv) it did not act independently in issuing and revising ratings for the Certificates; (v) it did not consider all relevant data in issuing and surveilling ratings of the Certificates; and (vi) the data used in its model was based on the historical

performance of prime loans and/or other debt unlike the subprime loans and other "affordability" loan products underlying the Certificates, and therefore, there was no basis for their ratings.

197.    Moody's had a duty to disclose the omitted material facts set forth above.  Such duty arose, in part, from Moody's business of supplying information in the form of ratings to guide others in making investment decisions.

198.    FNBR was actually deceived by the AAA ratings on the Certificates into believing that the Certificates had a very small chance of default and loss and purchased the Certificates based on such ratings being true.  FNBR was also deceived by the omissions listed above and would not have purchased the Certificates had it known of the omissions.

199.    Plaintiff has suffered actual damages as a result of the RAs unfair and/or deceptive trade practices and unfair methods of competition.  To date, FNBR has suffered $1,792,000 in write downs in the market values of the AAA RMBS it purchased during the class period, which are deemed other than temporary impairment ("OTTI").  The $1,792,000 write down is pursuant to "mark-to-market" or "fair value" accounting.  The write downs negatively impact both earnings and capital.  FNBR has also suffered higher FDIC fees and OCC fees, increased regulatory supervision, increased capital requirements, the loss of earnings arising from having less money to lend, and a default on its holding company loan.

200.    Class members have suffered similar damages.

## COUNT III

## FRAUDULENT MISREPRESENTATION AND OMISSION AGAINST S&P

203.    FNBR re-alleges all paragraphs above.

204.    S&P made false statements of material fact and material omissions as set forth

above in Counts I and II.

205.    As set forth above, S&P knew that the forgoing representations were false and that the foregoing omissions were concealment of existing material facts that acted as fraud upon FNBR and the other Class members.

206.    S&P's business consists of issuing ratings for the guidance of investors, including investors in subprime RMBS. S&P therefore intended to induce the Class members to purchase the Certificates based upon the ratings and upon its reputation for accuracy, independence, objectivity, well researched and supported models, integrity, ongoing surveillance and rigorous analysis of all information relevant to ratings both at issuance and thereafter.

207.    Plaintiff FNBR, along with the other Class members, purchased the Certificates in reliance on the AAA or investment grade ratings, the fact that federal law and regulations permitted Moody's and S&P to rate the Certificates for use in meeting statutory reserve requirements, and the reputation of Moody's and S&P for issuing and maintaining reliable and credible ratings and the inherent characteristics of accurate ratings--accuracy, independence, objectivity, integrity, well researched and supported models, integrity, ongoing surveillance and rigorous analysis of all information relevant to ratings both at issuance and thereafter.

208.    As a result of FNB's reliance as set forth above, FNBR has suffered $1,792,000 in write downs in the market values of the AAA or investment grade rated RMBS it purchased during the class period, which are deemed other than temporary impairment ("OTTI"). The $1,792,000 write down is pursuant to "mark-to-market" or "fair value" accounting. The write downs negatively impact both earnings and capital. FNBR has also suffered higher FDIC fees and OCC fees, increased regulatory supervision, increased capital requirements, the loss of

earnings arising from having less money to lend, and a default on its holding company loan.

209.    The Class members have suffered similar damages.

## COUNT IV

## FRAUDULENT MISREPRESENTATION AND OMISSION AGAINST MOODY'S

210.    FNBR re-alleges all paragraphs above.

211.    Moody's made false statements of material fact and material omissions in connection with its ratings of the Certificates as set forth in Counts I and II.

212.    As set forth above, Moody's knew that the forgoing representations were false and that the forgoing omissions concealed existing material facts that acted as fraud upon FNBR and the other Class members.

213.    Moody's business consists of issuing ratings for the guidance of investors, including investors in subprime RMBS.  Moody's therefore intended to induce the Class members to purchase the Certificates based upon the ratings and upon its reputation for accuracy, independence, objectivity, integrity, well researched and supported models, integrity, ongoing surveillance and rigorous analysis of all information relevant to ratings both at issuance and thereafter.

214.    Plaintiff FNBR, along with the other Class members, purchased the Certificates in reliance on the Aaa ratings, the fact that federal law and regulations permitted Moody's and S&P to rate the Certificates for use in meeting statutory reserve requirements, and the reputation of Moody's and S&P for issuing and maintaining reliable and credible ratings and the inherent characteristics of accurate ratings – accuracy, independence, objectivity, integrity, well researched and supported models, integrity, ongoing surveillance and rigorous analysis of all

information relevant to ratings both at issuance and thereafter.

215.     As a result of FNBR's reliance as set forth above,  FNBR has suffered $1,792,000 in write downs in the market values of the Certificates it purchased during the Class Period, which are deemed other than temporary impairment ("OTTI").  The $1,792,000 write down is pursuant to "mark-to-market" or "fair value" accounting.  The write downs negatively impact both earnings and capital.  FNBR has also suffered higher FDIC fees and OCC fees, increased regulatory supervision, increased capital requirements, the loss of earnings arising from having less money to lend, and a default on its holding company loan.

216.     Class members have suffered similar damages.

## COUNT V

## NEGLIGENT MISREPRESENTATION

217.     FNBR realleges all foregoing paragraphs.

218.     S&P and Moody's are in the business of supplying information—ratings—for the guidance of others in their business transactions.  The RAs had unique and special expertise in assessing the financial strength of the Certificates, including the current market value of the Certificates and the likelihood of repayment.  Additionally, the RAs had superior knowledge about the Certificates, including access to non-public, insider information about the Certificates.

219.     The RAs new that community banks such as FNBR relied on their ratings in purchasing the Certificates to meet regulatory reserve requirements.

220.     S&P and Moody's, while in a position of superior knowledge to FNBR and the other class members, rated the Certificates as AAA and maintained that rating throughout the class period, which implies that the RAs knew facts which supported the ratings and that they

- 83 -

had no facts that contradicted the ratings.

221.    Additionally, S&P and Moody's provided ratings on the Certificates that were misrepresentations in that both represented that they used models to predict delinquencies, defaults and losses that were based upon data sufficient to provide a basis for projecting same.

222.    However, Moody's did not use models to rate the Certificates until December 2006.  Thereafter, the Moody's model was based upon the historic performance of prime mortgages, which are not comparable to subprime RMBS, especially in a stagnant or falling market, and so cannot be the basis for a valid and accurate rating.

223.    Moody's also did not re-rate the Certificates during the Class Period.  Moody's failure to re-rate the Certificates during the Class Period constituted an affirmation that the Certificates maintained their market value, Aaa rating and the associated low credit risk.

224.    S&P's model similarly was based upon the historic performance of prime mortgages, which are not comparable to subprime RMBS, especially in a stagnant or falling market, and so cannot be the basis for a valid and accurate rating.

225.    S&P also did not re-rate the Certificates during the Class Period.  Such failure to re-rate the Certificates during the Class Period constituted an affirmation by S&P that the Certificates maintained their market value, AAA rating and the associated low credit risk.

226.    S&P's and Moody's negligence in issuing the ratings and in failing to re-rate the Certificates damaged FNBR.  To date, FNBR has suffered $1,792,000 in write downs in the market values of the Certificates it purchased during the Class Period, which are deemed other than temporary impairment ("OTTI").  The $1,792,000 write down is pursuant to "mark-to-market" or "fair value" accounting.  The write downs negatively impact both earnings and

capital. FNBR has also suffered higher FDIC fees and OCC fees, increased regulatory supervision, increased capital requirements, the loss of earnings arising from having less money to lend, and a default on its holding company loan.

227. Class members have suffered similar damages.

## PRAYER FOR RELIEF

Wherefore, the Plaintiff prays that this Honorable Court enter an Order:

(a) Determining that this action is a proper class action and certifying FNBR as class representative.

(b) Finding that Moody's and S&P have engaged in trade or commerce within the meaning of Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act;

(c) Finding that Moody's and S&P have violated Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2;

(d) Finding that Moody's and S&P have violated Section 2 of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2;

(e) Finding that Moody's and S&P have committed fraud;

(f) Finding that Moody's and S&P made negligent misrepresentations;

(g) Awarding actual damages to FNBR and the other class members against Moody's and S&P sustained as a result of Moody's and S&P's wrongdoing, jointly and severally, with interest thereon;

(h) Awarding Plaintiff all attorneys' fees, expert fees, costs and expenses incurred in this action;

(i)     Awarding all necessary injunctive and/or declaratory relief; and providing

such other relief as justice and equity may require.


Dated: August 12, 2013                    Respectfully submitted,

                                          TALCOTT FRANKLIN P.C.

                              By:         _____
                                          Derek S. Witte[10]
                                          ARDC No. 6278731
                                          40 North Pearl Street, Suite 924
                                          Grand Rapids, MI 49503
                                          Phone: (616) 719-3106
                                          Fax:    (877) 577-1356
                                          derek@talfranklin.com

                                          Talcott J. Franklin
                                          Martha Evans
                                          TALCOTT FRANKLIN P.C.[11]
                                          208 North Market Street, Suite 200
                                          Dallas, Texas 75202
                                          Phone: (214) 736-8730
                                          Fax:    (877) 577-1356
                                          tal@talfranklin.com

                                          Howard B. Prossnitz, Esq.
                                          ARDC No. 2258927
                                          Law Offices of Howard Prossnitz
                                          218 North Jefferson
                                          Suite 300
                                          Chicago, IL 60661
                                          312 382-8201
                                          312 382-8203 fax
                                          howard@prossnitzlaw.com

                                          *Counsel for Plaintiff*

---

[10] Mr. Witte has agreed to provide of counsel legal services through Talcott Franklin P.C. in this matter and is a member in good standing of the Illinois bar who also provides of counsel services to other law firms.

[11] *Pro Hac Vice* Motion to be filed for both Talcott Franklin and Martha Evans.